MICHAEL R. BROOKS
Nevada Bar No. 7287
mbrooks@ghidottiberger.com
GHIDOTTI | BERGER, LLP
7251 W. Lake Mead Blvd., Ste 470
Las Vegas, Nevada 89128
Telephone: (949) 427-2010

DUANE M. GECK (State Bar No. 114823) (admitted pro hac vice)
dmg@severson.com
DONALD H. CRAM (State Bar No. 160004) (admitted pro hac vice)
dhc@severson.com
ANDREW S. ELLIOTT (State Bar No. 254757) (admitted pro hac vice)
ase@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Plaintiffs
ALLY FINANCIAL INC., ALLY BANK and
MOTORS INSURANCE CORPORATION

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA, RENO DIVISION

| | |
|---|---|
| ALLY FINANCIAL INC., a Delaware corporation; ALLY BANK, a Utah state-chartered bank; MOTORS INSURANCE CORPORATION, a Michigan corporation,<br><br>                Plaintiffs,<br><br>        vs.<br><br>MOUNTAIN WEST AUTO GROUP LLC, a Nevada limited liability company; and KEVIN E. SHEPPARD, an individual,<br><br>                Defendants. | Case No. 3:24-cv-00268-MMD-CLB<br><br>**ALLY FINANCIAL INC.'S, ALLY BANK'S, AND MOTORS INSURANCE CORPORATION'S NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT**<br><br>The Hon. Miranda M. Du<br><br>[*Filed concurrently with Declaration of Victoria Dunn*] |

19001.0096/17074596.1

Case No. 3:24-cv-00268-MMD-CLB

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT plaintiffs Ally Financial Inc. ("Ally") and Ally Bank (collectively Ally and Ally Bank are referred to as the "Ally Parties"), together with Motors Insurance Corporation ("MIC," collectively with the Ally Parties, the "Plaintiffs"), will move and hereby does move the United States District Court, District of Nevada, located at 400 S. Virginia St., Reno, NV, The Hon. Miranda M. Du presiding, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1 for an order granting summary judgment or alternatively, partial summary judgment, against defendant Kevin E. Sheppard ("Sheppard").  This motion is made based on the accompanying memorandum of points and authorities, the Affidavit of Victoria Dunn, filed concurrently including the exhibits attached thereto, and the other papers and pleadings on file in this action.

Plaintiffs move for summary judgment on their Complaint, First Claim for Relief for the debt due from Sheppard under the Cross Agreement as alleged in the Complaint on the basis that the undisputed facts establish that Sheppard has failed to pay Plaintiffs the amounts due under the Cross Agreement, including interest and attorney's fees.

The Ally Parties move for summary judgment on their Complaint, Second Claim for Relief for the debt due from Sheppard under his Personal Guaranty Agreements as alleged in the Complaint on the basis that the undisputed facts establish that Sheppard has failed to pay the Ally Parties amounts due under Sheppard's Personal Guaranty Agreements, including interest and attorney's fees.

DATED:  July 23, 2025                          By:    _/s/ Andrew S. Elliott_____

Andrew S. Elliott, Esq.
Admitted *pro hac vice*
SEVERSON & WERSON
595 Market Street, Suite 2600
San Francisco, California 94105
Attorneys for Plaintiffs
ALLY FINANCIAL INC., ALLY BANK, and MOTORS INSURANCE CORPORATION

- and -

19001.0096/17074596.1                          1                    Case No. 3:24-cv-00268-MMD-CLB

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

By: ___/s/ *Michael R. Brooks*___

Michael R. Brooks
GHIDOTTI | BERGER, LLP
7251 W. Lake Mead Blvd., Ste. 470
Las Vegas, Nevada 89128
Telephone: (949) 427-2010
Email: mbrooks@ghidottiberger.com

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................................1

II.   SUMMARY OF MOTION ............................................................................................1

      A.    It Is Undisputed that Sheppard Guaranteed the Obligations of the
            Dealerships and MRH-Enterprises ...............................................................2

      B.    It Is Undisputed that the Dealerships Sold 87 Vehicles and Failed to Pay
            the Ally Parties ..............................................................................................2

      C.    It Is Undisputed that the Ally Parties' Disposition of the Collateral Was
            Commercially Reasonable ..............................................................................2

      D.    The Parties Disagree About the Fair Market Value of 80 Vehicles
            Repossessed for which the Ally Parties Have Not Sold Due to Title Issues ..............3

III.  CONCISE STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56-1 ...................3

      A.    The Loan Documents ......................................................................................3

            1.    Inventory Financing and Security Agreement with the Ally Parties ..............3

            2.    Term Loan Agreement ........................................................................4

            3.    The Advance Agreement ......................................................................4

            4.    The Cross Collateral, Cross Default, and Guaranty Agreement ...................6

            5.    Perfection of Security Interest .............................................................6

            6.    Sheppard's Guaranty Agreements .........................................................6

      B.    Events of Default – Sales Out of Trust ............................................................7

      C.    Dealerships' Bankruptcy Proceedings .............................................................8

      D.    The Ally Parties' Writ of Attachment ..............................................................9

      E.    Disposition of Collateral ................................................................................9

            1.    New Vehicles ....................................................................................10

            2.    Used Vehicles ...................................................................................10

      F.    Vehicles Lacking Marketable Title ...............................................................10

      G.    Balances Due under the Loan Documents .......................................................11

IV.   STANDARD FOR SUMMARY JUDGMENT ..............................................................11

V.    ARGUMENT ..............................................................................................................12

A.   No Triable Issue of Material Fact Exists as to the Plaintiffs' Cause of Action for Breach of the Cross Agreement Against Sheppard ................................12

    1.   Sheppard Entered into and Breached the Cross Agreement ......................13

    2.   There is No Dispute that Breach of the Inventory Financing Agreements, the Term Loan Agreement, and the Advance Agreement is a Default of Sheppard's Obligations to the Plaintiffs under the Cross Agreement and Entitled the Plaintiffs to Demand Payment from Sheppard ................................................................................15

B.   No Triable Issue of Material Fact Exists as to the Ally Parties' Cause of Action for Breach of the Sheppard Guarantees Against Sheppard .........................16

C.   The Ally Parties Disposed of the Collateral in a Commercially Reasonable Manner ...............................................................................................................17

    1.   The Unpaid Balance is due under the Inventory Financing Agreements.................................................................................................18

    2.   The Term Loan Agreement ........................................................................18

    3.   The Advance Agreement ............................................................................19

VI.   CONCLUSION ...................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alam v. Reno Hilton Corp.*,
    819 F.Supp. 905 (D.Nev.,1993) ................................................................................................ 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............................................................ 12

*Beard v. Ford Motor Credit Company*
    (Ark.Ct.App.1993) 850 S.W. 2d 23 .......................................................................................... 18

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir.1991) .................................................................................................... 12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................................ 11, 12

*Coehn–Breen v. Gray Television Group, Inc.*,
    661 F.Supp.2d 1158 (D.Nev.2009) ........................................................................................... 12

*Deery Motors, Inc. v. Steinbronn*,
    383 N.W.2d 553, 42 U.C.C. Rep.Serv. 1855 (Iowa 1986) ........................................................ 18

*In re Excello Press, Inc.*
    890 F.2d 896 (7th Cir. 1989) ..................................................................................................... 17

*Mount Vernon Dodge, Inc. v. Seattle-First National Bank*
    (Wash.App.1977) 18 Wash.App. 569 ....................................................................................... 18

*Siegel v. Federal Home Loan Mortg. Corp.*,
    143 F.3d 525 (9th Cir. 1998) ..................................................................................................... 13

**Statutes**

11 U.S.C. § 502(a) ............................................................................................................................ 13

Bankruptcy Code Title 11 Chapter 11 ........................................................................................... 8, 9

Nevada Commercial Code section 9320 ........................................................................................... 7

Nevada Uniform Commercial Code ................................................................................................... 1

NRS 104.9610, 104.9615 ............................................................................................................... 17

NRS 104.9627 (b) ........................................................................................................................... 17

NRS § 482.516 ................................................................................................................................. 8

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

UCC ......................................................................................................................... 5, 9, 17, 18

UCC Article 9 ........................................................................................................................ 17

UCC §9610(b) ....................................................................................................................... 17

UCC §9627(a) ....................................................................................................................... 17

UCC §9627(b) ....................................................................................................................... 17

**Other Authorities**

Fed. R. Civ. Pro., R. 56 ......................................................................................................... 11

Fed. R. Civ. Proc., Rule 56 .................................................................................................... 12

LOCAL RULE 56-1 ................................................................................................................ 3

Rule 56 ................................................................................................................................... 12

## I. INTRODUCTION

This is an action to recover the debt owed to plaintiffs Ally Financial Inc. ("Ally") and Ally Bank (collectively Ally and Ally Bank are referred to as the "Ally Parties"), together with Motors Insurance Corporation ("MIC," collectively with the Ally Parties, the "Plaintiffs"), for secured loans made by the Plaintiffs to non-parties MRH Auto-Reno, LLC ("MRH Reno"), MRH Auto-Winnemucca, LLC ("MRH-Winnemucca," and together with MRH-Reno, referred to as the "Dealerships"), and MRH Auto Enterprises, LLC ("MRH-Enterprises").  The loans made by the Plaintiffs financed the Dealerships' acquisition of equipment, parts, and new and used vehicles for inventory as well as other Dealerships' operations. Defendant Kevin E. Sheppard ("Sheppard") entered into three guaranty agreements and a cross guaranty agreement guaranteeing the obligations owed to the Plaintiffs by the Dealerships and MRH-Enterprises.[1]

Plaintiffs have sold the majority of the personal property collateral (vehicle and non-vehicle) securing its loans (collectively, the "Collateral") in compliance with the Nevada Uniform Commercial Code ("Nevada UCC") and Nevada law.  By this motion, Plaintiffs are requesting that the Court enter judgment in its favor against Sheppard for the debt amount that remains due to the Plaintiffs under the loans because the proceeds of the Collateral did not satisfy the debt in full.[2]

## II. SUMMARY OF MOTION

By this motion, Plaintiffs request that the Court enter summary judgment or alternatively partial summary judgment in the Plaintiffs' favor against defendant Sheppard in the amount of $6,735,015.42 or alternatively, on a revised debt amount determined by the Court based upon the undisputed material facts.  As explained below, after application of proceeds from the sale of the vehicle and non-vehicle collateral as well as other assets from the Dealerships, application of a credit from the writ of attachment to Sheppard's real property entered by this Court on October 17,

---

[1] MRH-Enterprises owns 100% of the membership interests of the Dealerships and Mountain West owns 100% of the membership interests of MRH-Enterprises.

[2] Defendant Mountain West Auto Group LLC ("Mountain West") also guaranteed the obligations of the Dealerships and MRH-Enterprises. The Clerk entered the default of defendant Mountain West on October 28, 2024.

2024, and after addition of the costs and expenses incurred by Plaintiffs in selling the Collateral, a debt of $6,735,015.42 (exclusive of attorney's fees and costs) remains due and owing to the Plaintiffs from Sheppard.  (Declaration of Victoria Dunn in Support of Ally Financial Inc.'s, Ally Bank's, and Motors Insurance Corporation's Motion for Summary Judgment or Alternatively for Partial Summary Judgment ("Dunn Decl."), ¶4.)

**A.      It Is Undisputed that Sheppard Guaranteed the Obligations of the Dealerships and MRH-Enterprises**

On or about June 11, 2021, Sheppard executed and delivered to the Ally Parties three written guaranty agreements (the "Sheppard Guarantees").  (Dunn Decl. ¶24.)  Additionally, on or about June 4, 2021, Sheppard executed and delivered to Plaintiffs a Cross Collateral, Cross Default, and Guaranty Agreement (the "Cross Agreement").  Under the Sheppard Guarantees and the Cross Agreement, Sheppard guaranteed full payment of the Dealerships' and MRH-Enterprises' present and future obligations to Plaintiffs including reasonable attorneys' fees and expenses incurred in enforcement.  (Dunn Decl. ¶25.)

**B.      It Is Undisputed that the Dealerships Sold 87 Vehicles and Failed to Pay the Ally Parties**

Sheppard does not dispute most of the debt.  As explained below there is no dispute—no genuine issue of material fact—that $3,081,626.54, constitutes money owed by Sheppard for 87 vehicles that the Dealerships sold "out-of-trust", keeping the $3,081,626.54 for themselves and failing to pay the proceeds of the vehicle sales to the Ally Parties even though the Ally Parties had financed the Dealerships' acquisition of the 87 vehicles, in breach of its loan agreements with the Ally Parties.  (Dunn Decl. ¶27.)

**C.      It Is Undisputed that the Ally Parties' Disposition of the Collateral Was Commercially Reasonable**

There is also no dispute that when the Ally Parties repossessed and sold the Collateral securing their loans that the Ally Parties' sale of 319 out of the 399 vehicles which secured the Ally Parties' loans was commercially reasonable, and there is no dispute that the Ally Parties' disposition of its non-vehicle collateral was commercially reasonable. (Dunn Decl. ¶¶41-43.)

19001.0096/17074596.1                                  2                        Case No. 3:24-cv-00268-MMD-CLB

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

**D.    The Parties Disagree About the Fair Market Value of 80 Vehicles Repossessed for which the Ally Parties Have Not Sold Due to Title Issues**

For 80 of the used vehicles repossessed, the Dealerships have failed or refused to provide certificates of title or other required title transfer documentation, which has severely impaired the Ally Parties' ability to dispose of these vehicles.  Sheppard does not dispute that the Ally Parties lack certificates of title or other required title transfer documentation for these vehicles.  The fair market value of these vehicles, considering the status of the title documentation, is $200,975. (Dunn Decl. ¶43.)

### III.  CONCISE STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56-1

**A.    The Loan Documents**

**1.    Inventory Financing and Security Agreement with the Ally Parties**

The Dealerships entered into a substantially similar Inventory Financing and Security Agreements with the Ally Parties dated as of April 26, 2019 (each, an "Inventory Financing Agreement").  (Dunn Decl. ¶5; Exs. A-B.)  Under the Inventory Financing Agreements, the Ally Parties provided the Dealerships with inventory financing (i.e., loans made pursuant to a revolving line of credit) for the acquisition of vehicles for sale and lease through the Dealerships' retail automotive sales business.  (*Id.*)  Upon the sale or lease of each vehicle, the Dealerships agreed to promptly pay the Ally Parties the amount of the loan advanced to the Dealerships to acquire the sold or leased vehicle.  (*Id.*)

Under the Inventory Financing Agreements, and in order to secure all present and future obligations of the Dealerships to the Ally Parties, the Dealerships granted the Ally Parties a continuing security interest in substantially all of the Dealerships' personal property, including all motor vehicles, as well as any proceeds from the sale or other disposition of such collateral (collectively referred to as the "Collateral").  (Dunn Decl. ¶6.)

The Ally Parties properly perfected their security interest in the Collateral by filing UCC-1 financing statements and amendments with the Office of the Secretary of State of Texas. (Dunn Decl. ¶7; Ex. F.)

Under the terms of the Inventory Financing Agreements, the Dealerships agreed that they

would fully, promptly and faithfully pay to the Ally Parties the amount of the loan advanced to the Dealerships, together with interest, other charges and fees provided for in the Inventory Financing Agreements. (Dunn Decl. ¶8.) The Dealerships agreed to repay the principal amount of such loans in full to the Ally Parties as each Vehicle was sold or leased. (*Id.*)

The Dealerships also agreed to the following terms and conditions as set forth in the Inventory Financing Agreements: (a) Upon the Dealerships' default, the Ally Parties have the right to repossess collateral, directly collect accounts and proceeds, and exercise other rights and remedies under the Inventory Financing Agreement and applicable law; and (b) the Ally Parties have the right to demand immediate payment in full of all obligations owed by the Dealerships. (Dunn Decl. ¶9.)

### 2. Term Loan Agreement

On April 30, 2019, MRH-Enterprises and MRH-Winnemucca entered into a Commercial Loan and Security Agreement with Ally Bank ("Term Loan Agreement"). (Dunn Decl. ¶10; Ex. C.) Under the Term Loan Agreement, Ally Bank agreed to lend $2,500,000 to MRH-Enterprises for its use in the acquisition of equipment. (*Id.*)

Under the Term Loan Agreement, MRH-Winnemucca granted Ally Bank a security interest in the MRH-Winnemucca Collateral. (Dunn Decl. ¶11.)

The Term Loan Agreement provides that the failure of MRH-Enterprises, MRH-Winnemucca or any affiliate or subsidiary of either to timely pay any amount owed to the Ally Parties constitutes as default under the Term Loan Agreement. (Dunn Decl. ¶12; Ex. C, III.J.1.)

In the event of a default under the Term Loan Agreement, Ally Bank is entitled to declare any and/or all amounts remaining unpaid thereunder to be immediately due and payable, and to take immediate possession of the MRH-Winnemucca Collateral, among other rights and remedies. (Dunn Decl. ¶13; Ex. C, III.K.1.d.)

### 3. The Advance Agreement

MRH-Enterprises, MRH-Reno, and MRH-Winnemucca entered into an Advance Agreement with MIC (the "Advance Agreement") pursuant to which MIC made an advance payment of one million five hundred thousand dollars ($1,500,000.00) ("Advance Payment") to

MRH-Enterprises, MRH-Reno, and MRH-Winnemucca to induce them to exclusively sell Ally Insurance Products to its customers.  (Dunn Decl. ¶14; Ex. D.)  The Advance Agreement includes Schedules A and B, effective April 30, 2019, as modified by updated Schedules A and B executed on November 5, 2020.  (*Id.*)

The Advance Agreement includes an agreed-upon formula for repayment of the Advance Payment based upon the application by MIC of credits against the amount of the Advance Payment due and owing by MRH-Enterprises, MRH-Reno, and MRH-Winnemucca to MIC for each Ally Insurance Product sold in the amount of the corresponding Advance Payment Credit indicated in Schedule A so long as MRH-Enterprises, MRH-Reno, and MRH-Winnemucca are not in default thereunder.  (Dunn Decl. ¶15.)

As security for their agreement to repay the Advance Payment to MIC, MRH-Enterprises, MRH-Reno, and MRH-Winnemucca granted MIC a continuing security interest in and a collateral assignment of the Collateral.  (Dunn Decl. ¶16.)

The Advance Agreement provides that the Advance Payment becomes immediately due and payable upon any default or material breach by MRH-Enterprises, MRH-Reno, and MRH-Winnemucca.  (Dunn Decl. ¶17; Ex. D, III.B.2 & 5.)

Pursuant to the Advance Agreement, MRH-Enterprises, MRH-Reno, and MRH-Winnemucca agreed to a cross-default provision providing that any default or breach by them or any entity or individual owning, owned by, affiliated or under common control with them under an agreement with the Ally Parties would constitute a breach under the Advance Agreement.  (Dunn Decl. ¶18; Ex. D, III.N.)

Under the Advance Agreement, MRH-Enterprises, MRH-Reno, and MRH-Winnemucca agreed to pay to MIC within ten days of MIC's demand for payment, any and all of MIC's costs, fees, and expenses including, without limitation, attorney and other legal fees, arising under or related to the enforcement of its rights under the Advance Agreement.  (Dunn Decl. ¶19; Ex. D, III.F.)

Ally Financial serves as a representative of MIC and is charged with perfecting security interests in favor of MIC by filing UCC-1 financing statements with the appropriate UCC filing

office. Ally Financial perfected MIC's security interests in the MRH-Reno and MRH-Winnemucca Collateral by filing UCC-1 financing statements and amendments with the Office of the Secretary of State of Texas.  (Dunn Decl. ¶20.)

### 4.  The Cross Collateral, Cross Default, and Guaranty Agreement

On June 4, 2021, in connection with Sheppard's acquisition of MRH-Reno, MRH-Winnemucca and MRH-Enterprises by stock purchase agreement with the former owners (Thomas Rackley and Robert Milner), MRH-Reno, MRH-Winnemucca, MRH-Enterprises, Mountain West, and Sheppard, among others, executed and delivered to the Ally Parties and to MIC a Cross Collateral, Cross Default, and Guaranty Agreement (the "Cross Agreement").  (Dunn Decl. ¶21; Ex. E.)

The Cross Agreement applies to MRH-Reno's, MRH-Winnemucca's, MRH-Enterprises', Mountain West's and Sheppard's, among others' (collectively referred to in the Cross Agreement as the "Dealership Parties"), indebtedness under the Inventory Financing Agreements, the Term Loan Agreement, the Advance Agreement and other loans or financing accommodations that the Ally Parties or MIC made to the Dealership Parties.  (Dunn Decl. ¶22.)  Under the Cross Agreement, the Dealership Parties guaranteed the performance and payment of MRH-Reno's, MRH-Winnemucca's, MRH-Enterprises', Mountain West's and Sheppard's, among others', obligations owed to the Ally Parties and to MIC.  (Dunn Decl. ¶22; Ex. E, pp. 2-3.)

### 5.  Perfection of Security Interest

The Plaintiffs perfected their security interests in the Collateral by filing a UCC-1 financing statements (including all amendments and continuation statements) as follows: a)  as to MRH-Reno Collateral, on April 19, 2019 with the Office of Secretary of State of Texas document number 19-0014307469; and b) as MRH-Winnemucca Collateral, on April 19, 2019 filed as document number 19-0014308470.  (Dunn Decl. ¶23; Ex. F.)

### 6.  Sheppard's Guaranty Agreements

On June 11, 2021, in connection with Sheppard's acquisition of ownership of the Dealerships through the stock purchase agreement with the former owners and in order to induce the Ally Parties to continue to extend financing to MRH-Reno, MRH-Winnemucca and MRH-

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

Enterprises, Sheppard made, executed and delivered to the Ally Parties three guaranty agreements (collectively, the "Sheppard Guarantees"). (Dunn Decl. ¶24; Ex. G.) Under the Sheppard Guarantees, Sheppard personally guaranteed full payment of all indebtedness of MRH-Reno, MRH-Winnemucca and MRH-Enterprises, to the Ally Parties together with all costs, expenses and attorneys' fees incurred by the Ally Parties in connection with any default of MRH-Reno, MRH-Winnemucca and MRH-Enterprises. (Dunn Decl. ¶25.) The Inventory Financing Agreements, the Term Loan Agreement, the Advance Agreement, the Cross Agreement, and the Sheppard Guarantees are collectively referred to as the "Loan Agreements."

**B.      Events of Default – Sales Out of Trust**

During the week of May 22, 2023, the Ally Parties conducted floorplan inventory audits of the Dealerships. (Dunn Decl. ¶27.) Based on these and subsequent inventory audits, the Ally Parties ultimately determined that the Dealerships sold and failed to timely pay for 87 vehicles out of trust[3] in the total amount of $3,081,626.54: MRH-Reno sold 74 of the 87 SOT vehicles and failed to pay $2,443,927; MRH-Winnemucca sold 13 of the 87 SOT vehicles and failed to pay $637,699.54. (*Id.*)

By letter dated May 30, 2023, the Ally Parties provided notice of the default to the Dealerships and demanded that they cure the SOT defaults. (Dunn Decl. ¶28; Ex. H.) The Dealerships failed to do so. (Dunn Decl. ¶28.)

The Dealerships' defaults under their respective Inventory Financing Agreements constitute a default under the Term Loan Agreement, Advance Agreement and the Cross Agreement. (Dunn Decl. ¶29.)

By letter dated June 12, 2023, the Ally Parties demanded that the Dealerships deliver

---

[3]      If a dealership fails to repay a flooring loan after the financed vehicle is sold by the dealership, in effect converting the borrowed loan funds to its own use, the dealership breaches its financing agreement with the Ally Parties and is said to be "sold out of trust" or "SOT." Moreover, the Ally Parties are directly harmed when a dealership sells a vehicle "SOT" because the Ally Parties' vehicle collateral is gone. An SOT is a serious breach of the financing agreement because the dealership's debt owed to the Ally Parties becomes unsecured – the Ally Parties cannot recover a vehicle sold to a customer in the ordinary course of business under Nevada Commercial Code section 9320.

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

physical control of all vehicle keys, all manufacturer certificates of origin, all certificates of title, and other title documents, and to surrender all Collateral, including all motor vehicle collateral. (Dunn Decl. ¶30; Ex. I.)

In response, the parties negotiated and entered into an Agreement for the Voluntary Surrender of Collateral dated as of June 16, 2023 (the "Voluntary Surrender Agreement"), pursuant to which the Dealerships agreed to allow the Ally Parties to repossess the vehicle collateral. (Dunn Decl. ¶31; Ex. J.)

The Ally Parties completed the removal of all available vehicles from the Dealerships' business premises during the week of June 26, 2023. (Dunn Decl. ¶32.) In total, the Ally Parties repossessed 399 vehicles from the Dealerships. (*Id.*) For 80 of the used vehicles, the Dealerships have failed or refused to provide certificates of title or other required title transfer documentation, which has severely impaired the Ally Parties' ability to dispose of these vehicles. (*Id.*)

On July 24, 2023, the Ally Parties provided written Notifications of Disposition of Collateral to the Dealerships and other required parties (the "Notifications").[4] (Dunn Decl. ¶33; Ex. K.)

**C.     Dealerships' Bankruptcy Proceedings**

On July 24, 2023 MRH-Reno and MRH-Winnemucca filed voluntary petitions for relief under Chapter 11 of the Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada; Case Nos. 23-50502 hlb and 23 50503 hlb respectively. (Dunn Decl. ¶34; Ex. L.) The Ally Parties filed Motions for Relief from the Automatic Stay to repossess and dispose of its collateral and the Dealerships (then still under the control of Sheppard) did not oppose these motions. (Dunn Decl. ¶35.) By bankruptcy court orders entered November 6, 2025 the Ally Parties obtained relief from the Automatic Stay allowing for the repossession and disposition of the Collateral. (Dunn Decl. ¶35; Ex. M.)

On November 27, 2023, MIC filed Proofs of Claim in the Dealerships' bankruptcy cases in

---

[4]     As will be further addressed in Plaintiffs' opposition to Sheppard's recently filed motion for summary judgment, NRS § 482.516 does not apply.

19001.0096/17074596.1                                    8                      Case No. 3:24-cv-00268-MMD-CLB

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

the amount of $691,948.25. (Dunn Decl. ¶36; Ex. N.)  Also on November 27, 2023, Ally and Ally Bank filed Proofs of Claim in the Dealerships' bankruptcy cases in the amount of $12,979,728.58. (*Id.*)  No party in interest, including the Dealerships and Sheppard, have objected to the Plaintiffs' Proofs of Claim.  (*Id.*)

On April 17, 2024, the Dealerships' bankruptcy cases were converted from Chapter 11 proceedings to Chapter 7 cases and Chapter 7 trustees were appointed.  (Dunn Decl. ¶37.)  By bankruptcy court order entered July 8, 2024, the Chapter 7 trustee in the MRH-Reno bankruptcy sold the non-vehicle personal property assets of the dealership for $50,000. (*Id.*)   Pursuant to an agreement between the MRH-Reno Chapter 7 trustee and Ally, Ally received $40,000 from the sale of these assets.  (Dunn Decl. ¶37.)  By bankruptcy court order entered May 15, 2025, the Chapter 7 trustee in the MRH-Winnemucca bankruptcy sold all the estates claims and causes of action to Ally.  (*Id.*)

**D.     The Ally Parties' Writ of Attachment**

On October 17, 2024, this Court issued an Order granting the Ally Parties' application for writ of attachment.  (Dunn Decl. ¶38; Dkt. 53.)  On October 23, 2024, the Court issued an Order granting a Writ of Attachment to certain property including but not limited to real property located at 197 North Argyle Court, Reno, Nevada 89511 (the "Property").  (Dunn Decl. ¶38; Dkt. 59.)  On October 28, 2024, the Ally Parties recorded the Writ of Attachment with the Washoe County Recorder's Office, Document Number 5493740.  (Dunn Decl. ¶38; Ex. O.)  On or around December 9, 2024, Sheppard and the Ally Parties entered into an agreement whereby $223,678.28 from the net sale of proceeds from the Property would be applied to the outstanding obligations owed to the Ally Parties by Sheppard.  (Dunn Decl. ¶38.)

**E.     Disposition of Collateral**

As detailed above, on November 6, 2023, the Bankruptcy Court entered orders granting the Ally Parties relief from the automatic stay, permitting the Ally Parties to dispose of the Collateral consistent with state law.  (Dunn Decl. ¶39.)

On various dates after November 6, 2023, the Ally Parties disposed of portions of the Collateral in compliance with the UCC by disposing of most of the vehicle collateral in one of

three commercially reasonable ways: (1) with assistance from the manufacturers, placed new vehicles with neighboring dealerships; (2) sale at dealer-only auctions; 3) direct sale to a third party. (Dunn Decl. ¶40.)

### 1.    New Vehicles

The Ally Parties negotiated a deal with the manufacturer to sell 47 repossessed new vehicles to another dealership for $2,692,231.90, which is only $112,585.10 less than the total amount that the 47 vehicles were financed for by the Ally Parties. (Dunn Decl. ¶41.)  The remaining 5 repossessed new vehicles were sold by the Ally Parties directly to other dealers via physical auction, leaving a shortfall to the Ally Parties from the sale of these five new vehicles of $83,389.66.  The proceeds from sale of the repossessed new vehicles were applied to reduce the outstanding advances due from the Dealerships to the Ally Parties for the respective vehicles. (Dunn Decl. ¶41.)

### 2.    Used Vehicles

The Ally Parties repossessed and sold 267 used vehicles directly to other dealers via online or actual, physical auction.  The proceeds from sale of the repossessed used vehicles were applied to reduce the outstanding advances due from the Dealerships to the Ally Parties for the respective vehicles. (Dunn Decl. ¶42.)

### F.    Vehicles Lacking Marketable Title

Of the 399 vehicles repossessed by the Ally Parties from the Dealerships' premises, 80 of the used vehicles lack certificates of title or other required title transfer documentation. (Dunn Decl. ¶43.)  Accordingly, the Ally Parties have been severely impaired in their ability to sell or otherwise dispose of these vehicles.  The Ally Parties have received an offer to purchase these remaining vehicles on an "as is" basis for the sum of $200,975, which the Ally Parties have accepted. (*Id.*)  The Ally Parties anticipate that the closing on the sale of these 80 vehicles will occur sometime in the next 90 days. (*Id.*)  When received, the Ally Parties will apply the net proceeds to reduce the amount owed, including, if applicable, by partially satisfying any judgment granted.

**G.    Balances Due under the Loan Documents**

After application of the net proceeds from the Ally Parties' disposition of the Collateral, as of July 23, 2025, there is due and owing the following amounts:

| MRH-Reno Inventory Financing | | Amount Owed |
|---|---|---|
| Inventory Financing | | |
| Principal Outstanding | | $3,902,581.09 |
| Interest, Expenses & Fees | | $799,399.20 |
| **Subtotal** | | **$4,701,980.29** |

| MRH-Winnemucca Inventory Financing | | Amount Owed |
|---|---|---|
| Inventory Financing | | |
| Principal Outstanding | | $816,264.19 |
| Interest, Expenses & Fees | | $459,019.98 |
| **Subtotal** | | **$1,275,284.17** |

| Term Loan Agreement | | Amount Owed |
|---|---|---|
| Principal Outstanding | | $8,130.53 |
| Interest, Expenses, Late Fees and Insurance | | $71,729.73 |
| **Subtotal** | | **$79,860.26** |

| Advance Agreement | | Amount Owed |
|---|---|---|
| Amount Outstanding | | $677,890.70 |
| **Subtotal** | | **$677,890.70** |

| Total Outstanding | | Amount Owed |
|---|---|---|
| MRH-Reno Inventory Financing | | $4,701,980.29 |
| MRH-Winnemucca Inventory Financing | | $1,275,284.17 |
| Term Loan Agreement | | $79,860.26 |
| Advance Agreement | | $677,890.70 |
| **Total** | | **$6,735,015.42** |

(Dunn Decl. ¶44.)

## IV.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  (Fed. R. Civ. Pro., R. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).)  Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (*Id.,* (citations).)

The party seeking summary judgment always has the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. But there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. (*Id.*, (citations).) Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Alam v. Reno Hilton Corp.*, 819 F.Supp. 905, 909 (D.Nev.,1993); *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409 (9th Cir.1991).

## V. ARGUMENT

All of the Plaintiffs' causes of action are for breach of contract: the first is for breach of the Cross Agreement and the second is for breach of the Sheppard Guarantees. The elements of breach of contract are: "(1) the existence of a valid contract; (2) a breach by the defendant; and (3) damages as a result of the breach." *Coehn–Breen v. Gray Television Group, Inc.,* 661 F.Supp.2d 1158, 1171 (D.Nev.2009). As demonstrated below, there is no triable issue as to any material fact in connection with Sheppard's breach of the Cross Agreement and the Sheppard Guarantees, thus, Plaintiffs are entitled to judgment as a matter of law. (Fed. R. Civ. Proc., Rule 56.)

**A.   No Triable Issue of Material Fact Exists as to the Plaintiffs' Cause of Action for Breach of the Cross Agreement Against Sheppard**

Plaintiffs' First Claim for Relief for "Breach of Cross Agreement" against Sheppard is based on Sheppard's failure to repay the amount due under the Cross Agreement because of the Dealerships' defaults under their respective Inventory Financing Agreements, MRH-Enterprises' and MRH-Winnemucca's default under the terms of the Term Loan Agreement, and MRH-

19001.0096/17074596.1                                         12                    Case No. 3:24-cv-00268-MMD-CLB

Enterprises, MRH-Reno, and MRH-Winnemucca's default under the Advance Agreement. Based on the uncontroverted facts of this case, there is no dispute or genuine issue of material fact that Sheppard breached the Cross Agreement.

### 1. Sheppard Entered into and Breached the Cross Agreement

On or about June 4, 2021, Sheppard entered into and signed the Cross Agreement. (Dunn Decl. ¶45.) As of July 23, 2025, described further below, there was owing and unpaid to the Plaintiffs under the Cross Agreement $6,735,015.42, comprised of the total balances due under the MRH-Reno Inventory Financing Agreement ($4,701,980.29), the MRH-Winnemucca Inventory Financing Agreement ($1,275,284.17), the Term Loan Agreement ($79,860.26), and the Advance Agreement ($677,890.70). (Dunn Decl. ¶46.) Sheppard does not dispute this. Plaintiffs have demanded that Sheppard pay the amounts owing under the Cross Agreement, but despite this demand, Sheppard has failed and refused to do so. (Dunn Decl. ¶47.)

As described above, the Ally Parties have performed all conditions, covenants and promises required of them in accordance with the terms and conditions of the Inventory Financing Agreements. (Dunn Decl. ¶48.) MRH-Reno and MRH-Winnemucca defaulted under the Inventory Financing Agreements by failing to cure the SOT defaults described above, among other defaults. (*Id.*) As of May 31, 2024, the balance due to the Ally Parties from MRH-Reno under its Inventory Financing Agreement is $4,701,980.29, and the balance due to the Ally Parties from MRH-Winnemucca under its Inventory Financing Agreement is $1,275,284.17. (Dunn Decl. ¶48.) The Ally Parties have demanded that MRH-Reno and MRH-Winnemucca pay the amounts owing but despite such demands, MRH-Reno and MRH-Winnemucca have failed and refused to do so. (Dunn Decl. ¶49.) The Ally Parties submitted Proofs of Claim in the Dealerships' bankruptcy proceedings for which no objection from any party in interest has been made. (Dunn Decl. ¶49.) As such, the claim amounts set forth in the Ally Parties' Proofs of Claim are allowed in the context of the Dealerships' bankruptcy proceedings pursuant to 11 U.S.C. § 502(a) and carry preclusive effect in this matter. *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998).

As also described above, MRH-Enterprises is in default under the Term Loan Agreement

19001.0096/17074596.1         13         Case No. 3:24-cv-00268-MMD-CLB

because it has failed to make required monthly payments since May of 2024, among other defaults. (Dunn Decl. ¶50.) Additionally, the Dealerships' defaults under their respective Inventory Financing Agreements constitute a default under the Term Loan Agreement. (*Id.*) As of July 23, 2025, the balance due under the Term Loan Agreement is $79,860.26. (*Id.*) Interest and other charges continue to accrue at the rate stated in the Term Loan Agreement. (*Id.*) Ally Bank has demanded that MRH-Enterprises pay the amounts owing under the Term Loan Agreement but despite this demand, MRH-Enterprises has failed and refused to do so. (*Id.*)

MIC has performed all conditions, covenants and promises required of it in accordance with the terms and conditions of the Advance Agreement. (Dunn Decl. ¶51.) MRH-Enterprises, MRH-Reno, and MRH-Winnemucca defaulted under the Advance Agreement by failing to make "True-Up Payments" as required under such agreement, which constitutes a default.[5] (Dunn Decl. ¶51.) Additionally, the Dealerships' defaults under their respective Inventory Financing Agreements constitute a default under the Advance Agreement. (*Id.*) As a result of these defaults, and others, repayment of the Advance Payment became immediately due and payable to MIC. (*Id.*)

As of July 23, 2025, the balance due under the Advance Agreement from MRH-Enterprises, MRH-Reno, and MRH-Winnemucca is $677,890.70. (Dunn Decl. ¶52.) MIC has demanded that MRH-Enterprises, MRH-Reno, and MRH-Winnemucca pay the amounts owing but despite such demands, MRH-Enterprises, MRH-Reno, and MRH-Winnemucca have failed and refused to do so. (*Id.*)

By the terms of the Inventory Financing Agreements, the Term Loan Agreement, and the Advance Agreement, MRH-Enterprises, MRH-Reno, and MRH-Winnemucca have agreed to pay reasonable attorneys' fees and costs incurred by the Plaintiffs in enforcing their rights thereunder. (Dunn Decl. ¶53.) By reason of the defaults described above, it has become necessary for the

---

[5] Similarly, MIC submitted Proofs of Claim in the Dealerships' bankruptcy proceedings for which no objection from any party in interest has been made. (Dunn Decl. ¶36.) As such, the claim amounts set forth in MIC's Proofs of Claim are allowed in the context of the Dealerships' bankruptcy proceedings and carry preclusive effect in this matter.

Plaintiffs to employ the undersigned counsel to commence and prosecute this action and the Plaintiffs are entitled to recover its attorneys' fees and costs incurred herein.  (*Id.*)

**2.      There is No Dispute that Breach of the Inventory Financing Agreements, the Term Loan Agreement, and the Advance Agreement is a Default of Sheppard's Obligations to the Plaintiffs under the Cross Agreement and Entitled the Plaintiffs to Demand Payment from Sheppard**

There is no dispute that the defaults under the Inventory Financing Agreements, the Term Loan Agreement, and the Advance Agreement constituted a default of obligations to the Plaintiffs under the Cross Agreement, entitling the Plaintiffs to exercise their rights to declare all obligations of Sheppard due and payable.  (Dunn Decl. ¶54.)  As described above, the Ally Parties and MIC have performed all conditions, covenants, and promises required of them in accordance with the terms of the Cross Agreement.  Under the Cross Agreement "it is agreed that any default or breach by any of the Dealership Parties in the payment or performance under any of the Financing Accommodations will, at the option of the Ally Parties [defined therein as including MIC], constitute a default under each Financing Accommodation."  (Dunn Decl. ¶54.)  The term "Financing Accommodation" is defined as "the Security Agreement(s) and any and all other agreements evidencing an Obligation."  The term "Obligation" means:

> any liability, indebtedness or obligation of every kind and nature, now existing or hereafter arising, whether created directly, indirectly or acquired by assignment, whether matured or unmatured, and any cost or expense, including without limitation reasonable attorneys' fees, incurred in the collection or enforcement of any such obligation of any one or more of the Dealership Parties, owed by any one or more of the Dealership Parties to one or more of the Ally Parties, any successor, assign, subsidiary or affiliate of Ally Parties.

(Dunn Decl. ¶54.)

As of July 23, 2025, the total principal indebtedness due under the Cross Agreement to Ally and Ally Bank is $6,735,015.42, comprised of the total balances due under the MRH-Reno Inventory Financing Agreement ($4,701,980.29), the MRH-Winnemucca Inventory Financing Agreement ($1,275,284.17), and the Term Loan Agreement ($79,860.26).  (Dunn Decl. ¶55.)  As of May 31, 2024, the total principal indebtedness due under the Cross Agreement to MIC is $677,890.70.  (Dunn Decl. ¶55.)  Sheppard does not and cannot dispute this.

19001.0096/17074596.1                    15                   Case No. 3:24-cv-00268-MMD-CLB

The Plaintiffs have demanded that Sheppard pay the amounts owing, but despite this demand, Sheppard has failed and refused to do so.  By the terms of the Cross Agreement, Sheppard agreed to pay reasonable attorneys' fees and costs incurred by the Plaintiffs in enforcing their rights thereunder.  (Dunn Decl. ¶66.)

**B.      No Triable Issue of Material Fact Exists as to the Ally Parties' Cause of Action for Breach of the Sheppard Guarantees Against Sheppard**

The Ally Parties' Second Claim for Relief for "Breach of the Personal Guarantees" against Sheppard is based on Sheppard's failure to repay the amount due under the Sheppard Guarantees. Based on the uncontroverted facts of this case, there is no dispute or genuine issue of material fact that Sheppard has outstanding obligations due and owing under the Sheppard Guarantees.

It is undisputed that on or about June 11, 2021, Sheppard executed and delivered three written guaranty agreements to the Ally Parties (collectively, the "Sheppard Guarantees").  (Dunn Decl. ¶57.)  Under the Sheppard Guarantees, Sheppard guaranteed full payment of the present and future obligations of MRH-Reno, MRH-Winnemucca, and MRH-Enterprises to the Ally Parties, including reasonable attorneys' fees and expenses incurred in enforcement.  (Dunn Decl. ¶58.)  As set forth above, the Ally Parties performed under the Inventory Financing Agreements and the Term Loan by making the loans.  (Dunn Decl. ¶59.)  The indebtedness owing under those loans is within the scope of the Sheppard Guarantees.  (*Id.*)

There is now owing and unpaid to the Ally Parties under the Sheppard Guarantees, $6,735,015.42 (excluding attorney's fees and costs).  (Dunn Decl. ¶60.)  Specifically, $4,701,980.29 is the amount of indebtedness owed to the Ally Parties under MRH-Reno's Inventory Financing Agreement; $1,275,284.17 is the amount of indebtedness owed to Ally and Ally Bank under MRH-Winnemucca's Inventory Financing Agreement; and $79,860.26 is the amount of indebtedness owed to Ally Bank under the Term Loan Agreement by MRH-Enterprises and MRH-Winnemucca.  (*Id.*)  The Ally Parties have demanded that Sheppard pay the amounts owing under the Sheppard Guaranties, but despite this demand, Sheppard has failed and refused to do so.  (*Id.*)

**C.     The Ally Parties Disposed of the Collateral in a Commercially Reasonable Manner**

After obtaining relief from stay, the Ally Parties took possession of and disposed of the Collateral as permitted by the UCC.  (Dunn Decl. ¶61.)

The UCC requires only that a creditor's sale of the debtor's collateral be done in a commercially reasonable manner.  UCC §9610(b); *see* NRS 104.9610, 104.9615; *see also, In re Excello Press, Inc.* 890 F.2d 896, 907 (7th Cir. 1989).  ["To summarize, the main question in a deficiency action is the commercial reasonableness of the disposition of the collateral."]

The Ally Parties disposed of a majority of the Collateral in a commercially reasonable manner.  The supporting evidence confirms this.  (Dunn Decl. ¶62.)

The sale of collateral is "commercially reasonable" if it is done (1) "[i]n the usual manner on any recognized market," or (2) "[a]t the price current in any recognized market at the time of the disposition," or (3) "[o]therwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."  UCC §9627(b);  *see* NRS 104.9627 (b).  If the collateral is disposed of in one of these ways, it does not matter whether "a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party …"  UCC §9627(a);  *see* NRS 104.9627 (b).

Furthermore, the Dealerships and the Ally Parties contractually agreed that the following non-exclusive methods of Collateral disposition are commercially reasonable under Article 9 of the UCC:

- Repurchase of any Vehicle, parts, or accessories manufactured by the original Vehicle Seller pursuant to the terms of a repurchase agreement between such Ally Party and Vehicle Seller, in accordance with a franchise granted to Dealership by the Vehicle Seller or pursuant to any applicable state law that requires a repurchase of Vehicles, parts, or accessories;

- Sale to the highest cash bid from dealers in the type of property repossessed, whether in bulk or parcels; and

- Sale at any physical or virtual auction, including SmartAuction, at which only dealers of multiple or single Vehicle manufacturer are generally invited to attend.

(Dunn Decl., ¶63, Exs. A-B, III.J.8(a), (b), and (c).)

Sheppard had notice of disposition via the Notifications and the Orders granting the Ally Parties relief from stay. (Dunn Decl. ¶64.)   Thereafter, the Ally Parties complied with the UCC by disposing of the Collateral in commercially reasonable ways. (*Id.*)

The courts have agreed that sales of automobiles at auctions open only to dealers for the highest price are commercially reasonable under the UCC. *See Mount Vernon Dodge, Inc. v. Seattle-First National Bank* (Wash.App.1977) 18 Wash.App. 569, 587; *Beard v. Ford Motor Credit Company* (Ark.Ct.App.1993) 850 S.W. 2d 23; *Deery Motors, Inc. v. Steinbronn,* 383 N.W.2d 553, 42 U.C.C. Rep.Serv. 1855, 1859 (Iowa 1986).  For the same reasons that dealer auctions are deemed a commercially reasonable way to dispose of vehicles, the sale of vehicles through an online auction should be deemed commercially reasonable and is deemed commercially reasonable by way of contract.

After the Ally Parties disposed of the new and used vehicles, and the bankruptcy trustee sold the remaining non-vehicle assets of the Dealerships, and after application of proceeds from disposition of the Collateral towards the amounts owed to the Plaintiffs, Sheppard remains indebted to the Plaintiffs under the Cross Agreement and the Sheppard Guarantees in the amount of $6,735,015.42.  (Dunn Decl. ¶65.)

### 1.    The Unpaid Balance is due under the Inventory Financing Agreements

Under the Inventory Financing Agreements, Sheppard owes the Ally Parties $112,585.10 for the deficiency on the new vehicles that the Ally Parties sold to a new dealership through the manufacturers and $83,389.66 from the sale of five new vehicles sold at auction.  In addition, Sheppard owes the Ally Parties $3,081,626.54 for the 87 SOT vehicles.  Further, Sheppard owes the Ally Parties $755,743.08 for the 31 vehicles repossessed but for which marketable title was not locatable.  Combined, including accrued interest, expenses and late fees, Sheppard owes the Ally Parties a total of $5,977,264.46 under the Inventory Financing Agreements (excluding attorney's fees and costs).  The supporting evidence confirm this.  (Dunn Decl. ¶66.)

### 2.    The Term Loan Agreement

Ally Bank applied the proceeds from the sale of non-vehicle personal property assets by the MRH-Reno Chapter 7 Trustee ($40,000.00), and the proceeds from the sale of the Property

THE ALLY PARTIES' NOTICE OF MOTION, MOTION, AND MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

under the Writ of Attachment ($223,678.28) to the outstanding balance owed under the Term Loan Agreement.  After application of these proceeds, and including accrued interest and late fees, Sheppard owes Ally Bank $79,860.26 under the Term Loan Agreement as of July 23, 2025. (Dunn Decl. ¶67.)

### 3.    The Advance Agreement

No proceeds from the sale of the Collateral have been applied to reduce the amount owed under the Advance Agreement.  Sheppard owes MIC $677,890.70 under the Advance Agreement as of July 23, 2025.  (Dunn Decl. ¶68.)

## VI.  CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully requests summary judgment or alternatively partial summary judgment in their favor on their claims for relief against Sheppard for the debt due to the Plaintiffs under the Cross Agreement and the Sheppard Guarantees in the amount of $6,735,015.42 or in some other amount if the Court finds that there are disputed issues of material fact as to the valuation of the Collateral securing its loans.

DATED:  July 23, 2025                    By:    */s/ Andrew S. Elliott*

        Andrew S. Elliott, Esq.
        Admitted *pro hac vice*
        SEVERSON & WERSON
        595 Market Street, Suite 2600
        San Francisco, California 94105
        Attorneys for Plaintiffs
        ALLY FINANCIAL INC., ALLY BANK, and MOTORS INSURANCE CORPORATION

        - and -

        By:    */s/ Michael R. Brooks*

        Michael R. Brooks
        GHIDOTTI | BERGER, LLP
        7251 W. Lake Mead Blvd., Ste. 470
        Las Vegas, Nevada 89128
        Telephone: (949) 427-2010
        Email: mbrooks@ghidottiberger.com