MICHAEL LEHNERS, ESQ.
429 Marsh Ave.
Reno, Nevada 89509
Nevada Bar Number 003331
(775) 786-1695
email michaellehners@yahoo.com
Attorney for Defendant
Kevin E. Sheppard

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

oOo

| | |
|---|---|
| ALLY FINANCIAL INC., a Delaware corporation; ALLY BANK, a Utah state chartered bank; MOTORS INSURANCE CORPORATION, a Michigan corporation,<br><br>Plaintiffs<br><br>vs.<br><br>MOUNTAIN WEST AUTO GROUP LLC, a Nevada limited liability company; and KEVIN E. SHEPPARD, an individual,<br><br>Defendants<br>_____________________________/ | Case No. 3:24-cv-00268-MMD-CLB<br><br><u>ORDER GRANTING STIPULATION TO WITHDRAW DEFENDANTS MOTION TO ALTER OR AMEND JUDGMENT</u> |

Defendant, Kevin E. Sheppard, and Plaintiffs, Ally Financial, Ally Bank, Motors Insurance Corporation file the following Stipulation to Withdraw Defendants Motion To Alter or Amend Judgment with prejudice.

1. On June 3, 2026 this Court entered its Order granting summary judgment in favor of Plaintiffs and against Defendant

Sheppard on Plaintiffs' breach of contract claims in the amount of $6,581,459.93 (ECF 91).

2. On July 24, 2023 MRH Auto-Reno, LLC filed for bankruptcy under Case No. BK-N 23-50502-hlb.

3. On July 23, 2025 the Chapter 7 Trustee filed an Adversary Proceeding against Ally Financial and Ally Bank under Case No. Adv. 25-05023-hlb.

4. On March 16, 2026 the Bankruptcy Court entered an Order in the Adversary appointing a settlement conference judge (Adv. ECF 18).

5. On May 14, 2026 the Chapter 7 Trustee and the Ally parties appeared before the Hon. Gregg W. Zive and participated in a settlement conference.

6. The Adversary parties reached a settlement that was placed on the record. A true and correct copy of the settlement transcript is attached as Exhibit"1".

7. The transcript reflected that there was to be a mutual release wherein the Ally parties released the Bankruptcy Estate from any claim that may exist. The transcript also reflected that the Ally parties waived distribution on both the Ally proof of claim and the insurance company's proof of claim. Exhibit "1", Page 35.

8. Defendant's counsel ordered the Adversary Settlement Conference Transcript and reviewed it prior to filing Defendant's Motion to Alter or Amend.

9. The Adversary Parties subsequently reduced the settlement agreement to a written agreement. It was attached to the Adversary Parties' Joint Motion to Approve Settlement Agreement, which was filed with the Bankruptcy Court on July 6, 2026.

10. The written settlement agreement between the Adversary Parties provides that the Ally Released Claims shall not include any claims the Ally parties may have against the Debtor or guarantors of the Debtor. A copy of this written settlement agreement has been attached as Exhibit "2".

11. In light of the language in the written settlement agreement, the parties agree that Defendant's Motion To Alter or Amend Judgment shall be withdrawn with prejudice.

Dated: 7/15/26

Michael Lehners, Esq.
Attorney for Defendant Kevin E. Sheppard

Dated: 7/15/26

/s/ Donald H. Cram

Donald H. Cram, Esq.
Attorney for the Plaintiffs

IT IS SO ORDERED

DATED this 16th day of July, 2026.

Miranda M. Du, U.S. District Judge

# Exhibit List

| | |
|---|---|
| Exhibit 1 | May 14, 2026 Settlement Transcript |
| Exhibit 2 | Written Settlement Agreement |

# Exhibit 1

Exhibit 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE: | Case No. 23-50502-hlb<br>Chapter 7 |
| MRH AUTO-RENO, LLC, | |
| Debtor. | |
| W. DONALD GIESEKE, CHAPTER 7 TRUSTEE, | Adv. No. 25-05023-hlb |
| Plaintiff, | 300 Booth Street<br>Reno, NV 89509 |
| v. | |
| ALLY FINANCIAL INC. et al.,<br>Defendants. | Thursday, May 14, 2026<br>9:05 a.m. |

TRANSCRIPT OF DOC# 1 ADVERSARY CASE 25-05023, COMPLAINT FILED BY W. DONALD GIESEKE, CHAPTER 7 TRUSTEE VS. ALLY FINANCIAL INC., ALLY BANK, N/A MOTORS INSURANCE CORPORATION, FEE AMOUNT 350
BEFORE THE HONORABLE GREGG W. ZIVE
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES CONTINUED.

Audio Operator: Natalie Clarke and Illuminada Hammill, CRD

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (Continued):

| | |
|---|---|
| For the Plaintiff: | Humphrey Law PLLC<br>By: L. EDWARD HUMPHREY, ESQ.<br>201 W. Liberty Street, Suite 202<br>Reno, NV 89501<br>(775) 420-3500 |
| | W. Donald Gieseke, Trustee<br>By: W. DONALD GIESEKE, ESQ.<br>18124 Wedge Pkwy., Ste 518<br>Reno, NV 89511<br>(775) 742-9107 |
| For the Defendants: | Stinson LLP<br>By: ANDREW S. ELLIOTT, ESQ.<br>595 Market Street, Suite 2600<br>San Francisco, CA 94105<br>(415) 398-3344 |
| | Severson & Werson<br>By: DONALD H. CRAM, ESQ.<br>595 Market Street, Suite 2600<br>San Francisco, CA 94105 |
| Also Present: | THOMAS O'BRIEN<br>MICHAEL ARAY<br>MICHAEL KEELER<br>DANIEL PHILLIPS |

(Proceedings commence at 9:05 a.m.)

THE COURT: That is not what I intend to try to accomplish today.

My -- and I -- of course, I've read Mr. Humphrey's that he filed -- settlement statement that he filed on behalf of the trustee. And one point that Mr. Humphrey made emphatically was that there was (audio break) --

THE CLERK: Yes, we're on the record.

THE COURT: We're on the record. This will be the only time we're on the record today, except if a settlement is arrived at, and I will -- we will put that on the record and make sure the parties agree to the terms, and they understand they're bound.

But I do believe that there will be a Rule 9019 motion filed that was to notice all parties, and Judge Barnes will have to make the decision whether or not to approve the settlement.

Is that correct, Donald and Ed?

MR. HUMPHREY: Yes, sir.

MR. CRAM: Yes, Your Honor.

THE COURT: But I'm going to emphasize right now from the beginning that if the parties go on the record and say they understand the terms and they understand they're bound, subject to perhaps some change in that situation based upon what Judge Barnes does, but as between the parties, they have an

agreement. They can't change it, except mutually. What I try -- what I say in a corporeal sense is there's no buyer remorse.

You know, settlements sometimes make people unhappy because they're compromises, and nobody generally gets everything they want. If you want that, go to trial. But you don't get the -- a settlement conference id kind of like a trial in one sense. You get ready, you know what your position is the day before, and then you articulate your position during this conference, and then you go home, and you go, oh, I wish I had done X, Y, or Z. Well, it's too late.

Once you're on the record saying you agree to the terms, you agree to it. No buyer remorse. Does everybody understand that?

The other point I really want to emphasize, everything that is said here today, any documents that have been provided to me with the confidential settlement statements are confidential. They can't be used in any other proceeding, in this case or anywhere else, unless they're the subject of discovery in that case or for that particular matter. Whatever anybody says here today is privileged (indiscernible). It cannot be disclosed. It's confidential.

The idea is to foster candid discussions without any fear that anything you say may be used in any proceedings against you. It's won't constitute an admission. You can say

whatever you want, except you should always be nice to your settlement judge.

But the point is we want to encourage a candid discussion. I expect everybody to be civil. This is a business proceeding. Any questions for me?

What we're going to do is I'll probably put you in your separate rooms right away. And I'll -- but first, before I do that, as I mentioned to Ed yesterday, and I think I told Mr. Cram, I'm going to let Ed explain what the trustee's position is. I know that the trustee made a demand subject to my order, I think it was $1.8 million. Am I correct, Ed?

MR. HUMPHREY: Yes, sir.

THE COURT: And I believe that the position of the Ally parties, and tell me if I'm wrong again, it was $150,000.

Is that correct, Donald?

MR. CRAM: That's accurate, Your Honor.

THE COURT: There's a fairly significant delta there. But in my conversations with counsel yesterday, they indicated that their clients understand that if they want to settle, they're going to have to make significant movement. One of the first things that I was concerned about was how the trustee would be able to present his case and how he would address the defenses that have been raised by the Ally parties, particularly ordinary course (indiscernible).

I think those are the primary defenses. Are they

not, Donald?

MR. CRAM: Primarily ordinary course, Your Honor.

THE COURT: Okay. There are two types of claims that are being litigated in the answer. One is fraudulent transfer, the other are preferences.

It is my understanding, and Ed, tell me if this is incorrect, that the primary trust of your adversary is seeking recovery for the preferences as opposed to the fraudulent transfers. Is that correct?

MR. HUMPHREY: Yes. I think that's generally correct. I think as we go through, some things have surfaced that may be fraudulent transfers or arguably constructive fraudulent transfers, and I think it is a relevant consideration.

But I think the trustee does face challenges with the fraudulent transfer claim given a guarantee, so you've got to set aside a guarantee because the major thrust of the fraudulent transfer claims is that our debtor, MRH Auto-Reno, paid the debts of other entities, and -- or paid the debts of others even. And so that's the main thrust of that claim. We understand the challenges with setting aside the guarantee in order to reach that.

THE COURT: When I talked to Donald yesterday, I think it would be fair to say he had arrived at the same conclusion, that the primary thrust of the trustee's position

and the avoidance actions are the preference claims. Correct, Donald?

MR. CRAM: That's correct, Your Honor. That's where we see the primary fight to be.

THE COURT: Well, let's see if we can make progress. I'm assuming that you're all here because you want to try to resolve it. So let's -- I think that perhaps the best way of proceeding is having Mr. Humphrey, have Ed explain the trustee's position regarding these matters and the underlying basis of the demand, and at the same time give a frank appraisal of the trustee's position and where there might be movement that would encourage discussion from the Ally parties to see if this matter can be resolved.

MR. HUMPHREY: Great. Thank you, Your Honor. Yes, as we progressed toward settlement, one of the things that I had requested was some information that we could tie separate payments to really get a baseline of understanding the transaction history and what was going on at various times.

And so that initiated with the subpoena to Ally that requested communications between the banks and the debtor. And one of the largest problems that the trustee's been hamstrung with, frankly, is the lack of debtor records. There's really very little access that the trustee has to much internal records of the debtor, unfortunately.

Unfortunately, Mr. Sheppard left the company in

shambles, and we haven't even had access to any workable electronic management system. I think they used Auto/Mate and something else to manage their inventory and transactions, and we've never had access to that stuff, which has been a problem. Due to financial constraints, they owed a big bill, and they're struggling to even get these companies to talk to us.

And then secondarily, there's a merger and some other stuff where it's a mess really to get some of the documents from the software company. So we went through and really started building the debtor's financial records from scratch. We took all the account information that we knew about, bank accounts, and really created the general ledger going back from the time that Kevin Sheppard's predecessors, Rackley and Milner, had acquired this dealership from John Stephens Internet Auto.

So we went all the way back to the beginning and really created a general ledger identifying potential avoidance claims along the way. This involved ultimately the subpoena of maybe 20 financial institutions and 72 accounts that we ended up uncovering through this process and watching how money flowed at different times during this entity's existence and how that changed over time.

And in that, we identified transactions to Ally and how the debtor was flowing money around, tripping money, I think Ally called it in their own correspondence or the limited

correspondence that we have, through a separate entity, MRH had a -- Kevin Sheppard's owner, MRH -- MRH's owner, Kevin Sheppard had another car dealership across the street, Mountain West Auto, LLC that he ran before this one.

And we learned throughout this process that he was using that entity, which never had any ownership in these car dealerships, to effectively store money in some sense. And we didn't -- we still don't know whether that -- the ultimate purpose of that was to hide money from Ally and ultimately led to like a Z-sweep account type of arrangement that's really wonky at separate banks, but it's like a quasi-sweep or something. But we identified that almost all of MRH's money flowed through this other entity and then back into the debtor portion of it, some (indiscernible) --

THE COURT: And I'm going to interrupt you for a moment. I think it is worth pointing out that there was specific disputes between the trustee and Mr. Sheppard that involved the business environment he has just described. That's a settlement that we participated in more than a week ago, and they've arrived at a consensual resolution that will be coming before all the parties pursuant to Rule 9019. Correct, Ed?

MR. HUMPHREY: That's correct.

THE COURT: Okay. So just so you know, that issue has been addressed.

MR. HUMPHREY: And so ultimately, we -- in the process of identifying Sheppard as a primary target of a fraudulent transfer action and other related claims, we identified preference payments, some of which had been identified in the schedules. And as we have progressed through this process, have learned more about the nature of the relationship between Ally and the MRH entities, even though I think we've barely scratched the surface, given our -- we may -- we might have six letters between the two entities from the very beginning.

One, because without going into a major issue with production and stuff during the subpoena, we tried to focus on the financial records, and so we got a lot of that stuff from Ally, but we still didn't quite understand how this worked. And we didn't really start to gain a cohesive picture, which I don't think we even have yet, but until Mr. Cram gave us a spreadsheet -- a series of spreadsheets in preparation for settlement a couple weeks ago.

And then we were supposed to have a discussion about how to interpret those records, because there's, you know, upwards of 3,000, 4,000 transactions involved here. Unfortunately, that meeting never happened.

That so-called, what I like to term as sort of the secret decoder ring on how to interpret Ally's internal documents was never provided. But we started -- my office

started looking at these documents or the settlement spreadsheets pretty in-depth when we received them from Mr. Cram. And through that process, we learned that the daily transactions or transfers that are even identified in the adversary complaint here were the product of the net calculations, meaning it was the net results. Each transaction between the entities was the result of transfers that were made to Ally, and then funding I think that Ally provided back through various flooring lines, and it was netted out.

So for example, if there was $200,000 in payoffs or payments that went from the MRH entity to Ally, but Ally funded $100,000 in new vehicle purchases, then what would show up on the bank records was $100,000. So it was netting those out.

And we started, when we got the spreadsheet from Mr. Cram, understanding the real difficulty of, and I'm sure Ally's lawyers have faced this, too, and I think it's been recognized in some of the communications between us, that just the sheer volume of transactions is brutality. And so we start sorting out all the different types of loan documents and different types of payments that were being made and trying to figure that out.

In the process, what we thought was really 2.2 or something million dollars in transactions that are listed on the complaint was really about a million dollars or so higher than that, more like 3 million, but there was a million in

funding kind of provided. That reduced those -- that figure to what's in the complaint.

So we ended up through the process here of identifying all the actual payments that went to Ally and that were netted out and then started trying to prepare for ordinary course defense. But one of the things that we were really facing an issue with is we couldn't determine whether or not the transfers to Ally based on these cars were ordinary course in the sense of, did they comply with the loan documents here in the flooring agreements, because it's a pretty significant consideration, particularly in the Ninth Circuit, on creation of a presumption almost that a late payment is not in the ordinary course. And so, because then the loan documents here require immediate payment.

So as soon as the customer takes the car and the contract is signed, the dealership is supposed to pay, and they're not supposed to wait for the dealership to get paid from the auto finance company unless there's a written agreement between Ally and MRH, and we don't have any of those. So we started identifying -- but we can't determine from Ally's documents at this time, at least didn't know -- didn't have the decoder ring, on how to determine the date that all the sales occurred, because we didn't have the internal sales records.

And that started to come into light on Monday when my office received spreadsheets that I believe Ally created in

anticipation of this settlement conference. My paralegal had saved those documents on our system. She was the one that received the email and advised me that it was there. She has not -- that particular paralegal has had no involvement with the analysis. All she does is document management in this case.

So I notify the other paralegal who's been doing the financial analysis and starts getting into those documents. The trustee then asked if he could see, we had discussed this, and he asked if he could see the base document. So I had that email forwarded to me from my paralegal so I could forward it to the trustee. And I read it for the first time yesterday and realized that that -- those documents may not have been meant for my office, although they were sent to my paralegal.

But we have gone through them as best as we can in the less than 48 hours or so that we've had to --

THE COURT: Let me see if I can provide some relief here. I don't know if Mr. Cram discussed this with you, but what I mentioned earlier, I consider those produced for the purpose of this settlement discussion. Therefore, they're confidential and not subject to disclosure.

You can use them to assist you because I don't think parties can really discuss settlement unless they're properly informed. There's no way lawyers can advise their clients what to do unless they have sufficient information. It could be

otherwise it's a lose-lose proposition.

So you have those documents. You're using them for the purpose of settlement. But if this matter doesn't settle, you're going to have to obtain records under the normal discovery rules. Is that understood?

MR. HUMPHREY: 100 percent.

THE COURT: Do you have any problem with that, Mr. Cram?

MR. CRAM: No, Your Honor, and that's how we submitted the documents in the context of the settlement conference.

THE COURT: That's what I thought. So I think we're okay, Ed. Go ahead with your discussion.

MR. HUMPHREY: Okay. So what we realized then is kind of what we anticipated just based on what I had been provided back in April, which was that Ally was going to go back and try to establish a base period or a baseline period for the preference action to establish the pre-preference period ordinary course going back to about February or so of 2022. And I think that matters to be correct after reviewing the documents we just received a couple days ago.

But what was important about those documents, and I want to go through a couple points on them, is that they reveal the sale date, at least the sale date that Ally is using. And so it was a pretty crucial piece of information for us. And so

going on, there's just a couple issues that we have, I think, with Ally's -- A, we've, again, had a day or two to really work on these in depth, and Ally's had months. So there's still quite a bit of information asymmetry.

But I think one of the biggest -- there's no question that this case is going to involve a significant litigation going forward, all of which is pretty much factual, meaning I don't think most of these issues are going to be primed for summary judgment. I think this is probably headed for a trial if it continues.

And the level of transactions, as Mr. Cram has recognized, is daunting in that respect. And I think it's going to get worse when I say this. In going through those sale dates, we realized that -- let's put this in context, several months ago when we were putting together the adversary complaints, particularly against Kevin Sheppard, what the trustee does have is not electronic records, but he's got a storage shed full of deal jackets of the whole history.

And so we went into that search, and I'm talking hundreds of bankers' boxes. I mean, I don't know exactly how many cars there were, but probably upwards of 2,000 vehicles or more. And one thing that the spreadsheets have allowed us to do is to organize them by car.

So we can see every transaction sorted by car. And so we can see when it was funded, when curtailment payments

were made, when the payoff was made, what the sale date was, or at least according to Ally. Well, when we were going through that storage shed to pull some deal jackets that related to the Sheppard case, we pulled about two bankers' boxes worth of deal jackets, and so maybe 40 or so cars.

And yesterday we spot-checked some of those deal jackets and come to realize that the sale date on Ally's side doesn't match the deal jacket in a lot of cases. And that is a significant issue. And I think we'll play into Ally's burden of proof on establishing ordinary course.

I think someone's going to have to go in there and literally look at thousands of deal jackets because there are significant, sometimes variations. I just have a couple. This is a car during the preference period that the payment came into Ally, where Ally was showing a sale date of 4/27, April 27th, but the deal jacket says --

THE COURT: What year was that? What year?

MR. HUMPHREY: 2023. This is April of 2023 of a Jeep Cherokee. The number ending in 6020. Sold to Miranda de Cervantes (phonetic). This is off several days, and I think that's going to make a difference in this case on how this goes.

And so there are some that are even more jacked up during the preference period. Literally, we only have 40 of these maybe deal jackets, and about 25 percent or more are off.

And so here's a deal jacket where Ally, it's actually opposite. And so this one shows Ally documents show this car was sold on April 28th. This is a Mitsubishi Outlander sold in April or May of '23 with a VIN number ending in 3595.

This one was sold to Alexander Anderson. This one, Ally documents show that it was sold on 4/28. However, the deal jacket says it wasn't sold until May 7th, ten days after, which means the payment would have arrived before the car was sold, which doesn't seem ordinary.

So there's -- I mean, there's a few more. Sometimes the things vary from one day to ten days off, and that's just a spot check. So I think that's one issue with, I think, Ally's analysis.

Another big issue is the baseline period chosen going back to February or so of 2022, which is about 12, 14 months or so before the preference period triggered. The relationship with this entity went back considerably longer. The factors, I'm sure you don't have to educate your attorneys on what the factors of assessing ordinary course are, but they involve much more than just putting together an average prepetition or pre-preference period and during the preference period.

And so I believe that the documents that Ally put together and submitted with their settlement conference brief were, I think, probably well done, but in my opinion, based on some faulty assumptions and some critical faulty assumptions.

The first is that there won't be a significant dispute over the accurate period of the baseline. And so during discovery, I think we'd request everything going back to the beginning.

And this is particularly relevant in this case because the case law establishes that in the Ninth Circuit, all evidence shedding light on the parties' relationship and the practices are relevant, not just what the date of the payment was. And so they're looking for things like enforcement actions and tightening of credit lines and a lot more. And what was really significant about the February 22 date chosen is there was a significant enforcement action right about that same exact time by Ally.

And the case law establishes that for the baseline period, you should go back to when the company was financially healthy. Ally was recognizing problems in writing, and based on the very, very limited communications that we have, very shortly, even before Kevin Sheppard took over, but particularly afterwards, including audit anomalies, all sorts of stuff right off the bat, daily balance problems, insolvency issues, undercapitalization. These issues were noted in several critical ventures during the course of the parties' relationship that we know won in February '22 when Ally chose its baseline period.

So we think that we'd have to go back considerably further than that into the relationship, and that would be the

subject of discovery. And I, you know, obviously can't use this spreadsheet, but that's a massive undertaking and potentially several days of PMK depositions.

MR. CRAM: Can I just interrupt you real quick, Ed? You mentioned that there may have been some inadvertent production. Can I ask you what you think was inadvertently produced?

MR. HUMPHREY: Yeah, hang on. I'm not sure what it was as far as --

THE COURT: Yesterday when I had a conversation with Ed Humphrey, Donald, I asked him to identify for me what had been produced, and I compared the titles that he had with the information you sent to me because I wanted to see if they were the same, and all but one was. So that's why, in my mind, they were all related directly to this settlement conference and therefore not subject to disclosure except for the purpose of this proceeding. (Indiscernible).

MR. HUMPHREY: It was a Monday -- go ahead.

MR. CRAM: As you say, it's the summary of arguments, and then it has five other PDFs and curtailment, smart option, term loan payments, wholesale interest, wholesale payoffs.

MR. HUMPHREY: The email sent to Jessica, it was sent to my paralegal by your staff on Monday morning.

MR. CRAM: Via email?

MR. HUMPHREY: Via email, correct.

THE COURT: They would utilize what Ed told me, and I think what he's repeating today, for the purpose -- as I've already stated, of preparing for the settlement conference. It can't be used for anything else. I've already made that clear.

MR. HUMPHREY: I didn't even realize that it could be inadvertent until yesterday. So we -- because I never saw the email that came in.

My paralegal saves the documents and let me know when discovery comes in and other issues come in. So she sent it yesterday, and I forwarded it to Don, and I see that it was an email basically asking -- one of your paralegals asking the other staff members how to put a watermark on there.

And so that's what we're talking about. We took those PDFs and converted them into Excel and worked from there, and then compared them against primarily the Schedule 4 that was emailed to me by Don Cram back in April, which was in Excel.

And so that's what my financial staff has been working with in the last day or so to try to figure out what was going on because, to tell you the truth, my settlement conference brief submitted the week before did complain, I think, vociferously about information asymmetry, and I've asked for that gap to be closed on several occasions. Unfortunately, that wasn't done consensually.

And so there's -- I guess it would have to be the

hard way.

THE COURT: What is the amount of preferences that --

MR. HUMPHREY: It's 3 point --

THE COURT: -- you would be seeking?

MR. HUMPHREY: It's about 3.1 million or so, give or take, 100,000.

THE COURT: Because I'm going to concentrate for today's purposes, subject to our discussion already, on the preference issues, not the fraudulent transfer. I don't consider those to be really significant for the purpose of trying to get a settlement. Would you agree with me, Ed?

MR. HUMPHREY: Correct.

THE COURT: Okay. So what you're looking for for the preference issues is about 3.3. Did I understand you correctly?

MR. HUMPHREY: Yeah, 3.1 or 3.2. I don't have the spreadsheet. And I don't want to (indiscernible).

THE COURT: It doesn't matter. (Indiscernible).

MR. HUMPHREY: It's in that neighborhood. Right.

THE COURT: And here's why I don't think the exact number is important, and I'll just put this out for all of you right now. I mean, you are significantly apart. You demanded, I think, Ed, 1.8.

MR. HUMPHREY: Correct.

THE COURT: And the (indiscernible) was at 150,000.

So the exact amounts don't really have a direct impact on the settlement position. I think the parties -- and the -- need to understand, and that's why I asked Ed to go first, the difficulty the trustee had and what I see for both sides. And I think Donald only discussed this briefly yesterday.

Discovery will be difficult. It will be lengthy. There are a number of issues that relate not only to the trustee satisfying his burden of proof, but also Ally satisfying its burdens of proof on the affirmative defenses.

And I think that Ed agreed that it would be difficult and it would be time-consuming and be expensive, and (indiscernible) Donald drew up the same position.

Am I correct about that, Donald?

MR. CRAM: Sort of, Your Honor. I think that we've -- in preparation certainly for today, we've spent a significant amount of time and resource analyzing the data, and we believe that our ordinary course defenses are pretty solid. That said, I mean, as far as defending, you know, discovery, responding to discovery, defending depositions, I agree wholeheartedly that, you know, these type of cases don't lend themselves to summary judgment. So I agree that there would be a trial of the issues, that there wouldn't be any type of dispositive motion.

So preparing for and presenting at trial, you know, given the large amount of transactions we're talking about

here, it's going to be expensive for both sides and probably more for the trustee side, you know, given that, you know, we've already kind of done our analysis.

THE COURT: And they have a problem apparently with cooperation from the debtor and its manager. So for what it's worth, I agree with what Ed has said and what Donald has said. I think going forward with discovery will be expensive, and I think a trial will be probably lengthier than many. There are many transactions. There are different temporal issues that have to be resolved. The legal issues are pretty self-evident. Those don't appear to me to be particularly difficult.

The difficulty is using the financial transactional histories and time those to the legal elements that need to be established by which party has the burden of proof on a particular matter. That's how I look at it. And I -- once you've heard from the lawyers, I don't think they disagree with that. And there's no doubt in my mind, after doing this now for 31 years, that there's no way that I see any judge, Judge Barnes in particular, would ever grant summary judgment on this matter.

So you're going to go forward if you can't settle. And if you can't settle, there's going to be significant costs and significant attorney's fees. That's the bottom line I have arrived at, and I think Donald, you agree, and Ed, you agree with me. Is that correct?

MR. CRAM: Yes, sir.

THE COURT: Okay. If you'll give me a moment.

MR. HUMPHREY: One more point, Your Honor, if I may.

THE COURT: I may be -- save it. I'll be back in a minute.

MR. HUMPHREY: Okay.

THE COURT: But I have to leave for a minute. So please excuse me.

Sorry to interrupt, but hold on just a minute.

Go ahead, Ed. I cut you off on something.

MR. HUMPHREY: Okay. No problem. So in addition to the discussions about the baseline period that we just had, we went with the data that we both had before back in April and then supplemented by some of the information that we received very recently, went through and started focusing on the preference transactions in particular.

And I think there's about 75 cars, 85 cars, sorry, that were paid off or some -- that was just the vehicle payoffs on the flooring line, but there's a whole bunch of other stuff on curtailments and interest and insurance and some of that. But there's anomalies with all of these types of things when we came in. It's not just the amount of the payment that went, it's the deal, how it went.

And so with the spreadsheet data or -- and or -- we ended up sorting things by VIN, as I mentioned earlier, and it

kind of revealed the transactional history for each of the cars. And it showed some very weird things. And we have questions about at least 36, 37 cars just in the last two days of the 85 that are listed during the preference period.

And we have also been looking at this in depth and would explore these issues even further. There's several. One of them is that the curtailment percentages don't always add up. It's supposed to be 10 percent, I believe, on a general non-demo car. There's some that are not 10 percent.

There is weirdness with insurance. There is insurance payments that don't seem associated with any vehicle or any car that we can identify in the spreadsheets. There is weird anomalies with cars that appear more than once as being floored more than once, sometimes in quick succession with each other, which is a problem because it looks like the car was floored and then paid off and then refloored, like very socn after some of them. And so I'm not sure why that happened, but that is -- we have a list of ten vehicles in our spot checks that are just like that. We're calling them sale buybacks or something.

There's really kind of issues also with the Ally auction that we didn't understand at all until this most recent production and why that really ramped up at the end of 2022, the use of Ally's own internal system and how that worked. And we ncticed that the date of sale that Ally has listed on its

settlement charts does not list the same date as the documents in Ally's other productions, which is problematic to us of why that was fudged here, why some of those dates don't match up.

There is, again, another 11 vehicles where there is premiums that are coming in at a weird time or payments that are coming in, double floors. So a ton of questions about each one of these cars that are quite problematic. And we've sorted them out just for now on our own list of, like I said, 37 cars that have problems.

We have issues with curtailment payments changing throughout the course. And so I think there's heavy, heavy, heavy disputes on the ordinariness or not ordinariness of these transactions. I mean, it almost seems like an issue to me that I don't know if anything was ever ordinary. So --

THE COURT: Is that it, Ed?

MR. HUMPHREY: Yeah, I think that's about it for now. We can provide specific VINs and some examples (indiscernible) --

THE COURT: Well, I'm not here -- we're not here to try them. The purpose of this is to make all the parties familiar with the other side's position so that there's an understanding of the difficulty that I think all parties are going to have going forward if you don't settle.

Don, would you like to respond at this time?

MR. CRAM: Well, I just -- I think I want to make

some general overall comments that --

THE COURT: Sure.

MR. CRAM: The, you know, the business of financing a dealership is complex initially. And I know that Ed or the trustee don't really understand the complexity or the nature of floor plan financing.

Our folks understand it very well and can explain it very well. And we believe that, you know, most, if not all, of the transactions we're talking about were made in the ordinary course of the relationship between the debtor and ally. In fact, I mean, there wasn't really a default until May of 2023.

And before that time, the dealer was paying -- I mean, if you line it up, the dealer was paying all obligations in the ordinary course of the debtor's business and consistent with time frames that were made in the past. And I'm certain if -- just to correct, the baseline period was from January 1st, 2022 through the preference period and not February 2022. And we just chose that date just to kind of give at least about a year and a half of worth of transactions as a baseline.

It wasn't -- we weren't trying to be nefarious in what we chose as a baseline period, but we're just trying to get a fair sample of what the transactions look like during that period. We certainly have data.

THE COURT: The purpose -- educate me. I'm just -- I don't -- I certainly don't know much about flooring agreements.

I had a couple of cases of them, but I think they are complex.

MR. CRAM: They are. Yeah -- go -- I'm sorry. I'm sorry, Your Honor.

THE COURT: But the purpose of the baseline period is to compare what was happening during that period to what was occurring in the alleged preference period. Is that correct or not correct?

MR. CRAM: Correct, Your Honor.

THE COURT: I understand it then. Thank you. Don, I interrupted you. Is there anything else you wanted to state?

MR. CRAM: With respect to the sales records, I mean, we have been asking for deal jackets from the debtor for years now and, you know, had not been successful in getting any kind of deal records. And we're surprised to -- and we're told that all those were previously turned over to Ally, which was never the case. So we're surprised to hear that the trustee has located those records.

But, you know, the -- I'm certain that the discrepancies between the sale dates in the specific deal jackets and the sale dates that are -- that we have basically analyzed from our data can be reconciled.

THE COURT: Thank you.

MR. HUMPHREY: It seems that we got different stories from Mr. Sheppard.

THE COURT: Well, they (indiscernible)

MR. HUMPHREY: We've got the electronic records --

MR. CRAM: Surprise.

MR. HUMPHREY: -- and we don't have the paper ones, right? So we understand your issues with Mr. Sheppard and I think identified where he took your money and put it, frankly.

THE COURT: I don't think there's any disagreement regarding Mr. Sheppard with you folks. That's all I'm going to say.

Judge Barnes will have a hearing regarding the 9019 motion. I will tell you, because it's going to be public, that there was considerable movement to get a settlement. And I'm not -- you folks have dealt with the particulars of the transactions. I'm now, if you don't mind, going to discuss what I see, notwithstanding those.

Because I don't know who would prevail, who wouldn't, except I will say that I do think that what you've heard, and we've had a lot of lawyers involved here, is that there are open questions that are going to have to be answered to be able to convince Judge Barnes of the positions that are being advocated. And they may be -- and I think it's like anything else, there are some strong ones, there are some weak positions. And she'll have to wrestle with those.

The point is is that you're all business people and you want to control your business and you can't do that during a trial. The last time you really get an opportunity to do

that is during a settlement, because you still have some control now. And there are some realities here.

Ed, I hope you -- I'm going to talk about the financial situation of the estate, if you don't mind. Do you have any problem with that?

MR. HUMPHREY: No.

THE COURT: This estate doesn't -- is -- doesn't have much money. Correct, Ed? And --

MR. HUMPHREY: That's correct. It's relying on, I think, in large part, on recoveries from adversary proceedings that have been filed. But there's also probably a couple more that will be filed. That deadline is still open. Right now the IRS is also a creditor. So there's time and there's a couple more. But, yes, I think funding to date has been an issue.

THE COURT: And that will continue. It may improve, it may not. But the point that I'm driving at is that the trustee has serious economic issues that may have a significant impact on how the trustee and counsel proceed and what limitations they may face as a result of those economic situations.

Would that be fair to say, Ed?

MR. HUMPHREY: I believe that's fair.

THE COURT: The only reason I mention that is because they're taking place into a settlement posture that the parties

are going to be taking here.

At the same time, the Ally entities have their own issues. They're going to have to prove their affirmative defenses. They don't have any control over what the judge, what she may or may not accept, and what she may or may not rely upon. And these are not simple.

MR. HUMPHREY: I have one more point on the fraudulent transfer issue that surfaced in the settlement documents that we received on Monday was that there was a $54,000 transaction noted for payment of what Ally classified as a non-debtor debt that Ally received money to pay off a retail customer's car. Understand that position on (indiscernible). The $54,000 that apparently MRH Auto-Reno paid toward a customer vehicle on a customer loan, and so Ally had classified this in its summary sheet as not a preference because there was no antecedent debt of the debtor. Good point, except for that it's a fraudulent transfer, and it's not a debt of one of the other MRH entities either. And so that is one that appears to be a fraudulent transfer claim that is not related to the guarantee.

THE COURT: Okay.

MR. HUMPHREY: And it's 55 grand. So you don't have to find many cars to get to significant numbers.

THE COURT: My point is this: There are economic realities that both parties, and I'm speaking about Ally

collectively, have to have recognized to me.

And I -- Ed, has your position changed on that, what you told me?

MR. HUMPHREY: No, it hasn't changed. I mean, there's a settlement with Sheppard that can help fund the estate. There are several more I think that will settle that can help fund the estate. But the estate has been hamstrung from the outset with financial issues.

THE COURT: Okay. But I'm talking about terms of settlement analysis.

MR. HUMPHREY: Yes, you're correct.

THE COURT: And Ed had indicated on behalf of you, Donald, and if you disagree, you better tell me now.

MR. HUMPHREY: Well, wait a second. If we're going to actually present an offer, we'd like to talk to you for just a minute before --

THE COURT: Oh, no, no, I'm not asking to do that.

MR. HUMPHREY: Okay. Okay. Great.

THE COURT: I'm speaking now that you indicated to me that you knew that you would have to make significant movement down to --

MR. HUMPHREY: Oh, absolutely.

THE COURT: -- (indiscernible) --

MR. HUMPHREY: Right.

THE COURT: -- and I passed that on to Donald.

Correct, Donald?

MR. CRAM: Yes, Your Honor, you did indicate that.

THE COURT: And we -- and Donald and I talked it. And I think it's fair to say that Donald has within time recognized that this case is going to settle -- and we're not talking here about judgment value. We're talking about settlement value. And that the Ally folks are going to have to move too, and significantly if they want to settle.

And he said he recognized that. They might be willing to do it. And it is on that predicate from both parties that I am intending to proceed today. If that is not what you want me to do, you're going to have to tell me when we meet, okay?

I'm going to meet with the trustee first, and then I'll get back to you, Donald, and your folks. I'm going to put you each in your separate rooms now, okay?

MR. HUMPHREY: Great.

MR. CRAM: Thank you.

THE COURT: Can you do that for me, please, Illuminada?

THE COURTROOM DEPUTY: Yes, Your Honor. I just need you as the host to please click open room --

(Recess taken at 10:01 a.m.)

(Proceedings resumed at 12:19 p.m.)

THE COURTROOM DEPUTY: Please raise your right hand.

(Parties sworn)

THE COURT: They both said I do. Thank you.

THE COURTROOM DEPUTY: Thank you.

THE COURT: This is in the matter of -- give me one moment -- MRH-Auto-Reno, LLC. It's Case Number 23-50502-hlb, and then is it -- the -- I think that's the adversary number. No, it isn't. The adversary number is 25-05023-hlb. And it probably should be in the summary -- the order of proving to someone if that's what occurs should be in both those files.

The parties have negotiated this morning, and they have arrived at a consensual resolution after negotiations, and I'm going to put it on the record. Then I will ask counsel if there's any changes or modifications or if there's anything I missed, and they can put that on the record as well.

The trustee has brought causes of relief for both fraudulent transfer and preferences, and this settlement is in relation to both. The Ally parties, and that's what I'll refer to them collectively as, have agreed to pay the trustee $250,000 within 21 days after the entry of an order approving the settlement, and there will be a motion pursuant to Federal Rule of Bankruptcy Procedure 2019 seeking approval of the settlement from Judge Hillary Barnes.

In addition to the payment of $250,000 within the time I have just specified, counsel for the Ally entities shall draft the documents necessary to memorialize the judgment.

Those include a motion under Rule 9019, form of an order under Rule 9019, and a settlement agreement that will contain the terms of the settlement, including a mutual release from any and all Ally entities against the estate for any claims that may exist, and also a release from the estate to the Ally entities that are parties to the settlement agreement.

In addition to the mutual release, the adversary shall be dismissed with prejudice 21 days after an order is approved -- excuse me, an order is granted approving the settlement.

The -- if I haven't said it, I should say: The settlement agreement, the 2019 motion, and like I said, the form of the order shall be prepared by counsel for an Ally, and I think that's going to be Mr. Cram from the Stinson firm. Is that correct, Mr. Cram?

MR. CRAM: Correct, Your Honor.

THE COURT: Is there anything I've overlooked or misstated, Mr. Cram?

MR. CRAM: The only thing, Your Honor, we had also agreed to waive distribution --

THE COURT: Oh, you're right. I forgot that.

MR. CRAM: -- on both the Ally proof of claim and the insurance company's proof of claim. And I believe the claims asserted by the trustee in the adversary proceeding included an objection to those claims. So this is a resolution of that

claim as well.

THE COURT: You're correct, sir. I appreciate that. And I assume since you're drafting the documents, that'll be included in the settlement agreement and in the motion.

MR. CRAM: Yes, Your Honor.

THE COURT: You agree to that, Mr. Gieseke?

MR. GIESEKE: Yes, I do. Thank you, Your Honor.

THE COURT: Okay. You have an agreement. Is there anything else from anybody else? No. So I'm glad it was a fairly straightforward settlement, because I was able to do most of it.

Mr. Keeler, would you put your name on the record, please?

MR. KEELER: Michael Keeler.

THE COURT: And what is your position?

MR. KEELER: I'm the Executive Director at Ally Bank.

THE COURT: And you have authority to enter into this settlement agreement on behalf of that entity as well as any other Ally-related entities?

MR. KEELER: I do, Your Honor, yes.

THE COURT: And do you exercise that authority?

MR. KEELER: I do, yes.

THE COURT: And you participated in the settlement negotiations. Is that correct?

MR. KEELER: That is correct.

THE COURT: And you're familiar with the terms that we placed on the record?

MR. KEELER: Yes.

THE COURT: And you understand them?

MR. KEELER: I do, yes.

THE COURT: And you agree to them?

MR. KEELER: I do agree.

THE COURT: Thank you. Do you have any questions for me?

MR. KEELER: No questions, Your Honor.

THE COURT: Anybody else have any questions for Mr. Keeler? Thank you.

Mr. Gieseke, please state your name.

MR. GIESEKE: John Gieseke, Chapter 7 trustee for the estate of MRH Auto-Reno.

THE COURT: And you participated in the settlement discussions today. Is that correct?

MR. GIESEKE: Yes, Your Honor.

THE COURT: And you heard the settlement terms that were placed on the record. Is that correct?

MR. GIESEKE: Yes, Your Honor.

THE COURT: And you understand them?

MR. GIESEKE: Yes.

THE COURT: And you agree to them?

MR. GIESEKE: Yes, I do.

THE COURT: And do you have authority to enter into that agreement on behalf of the estate in your capacity as trustee. Is that correct?

MR. GIESEKE: Yes, Your Honor.

THE COURT: Okay. Do you have any questions for me?

MR. GIESEKE: No, I do not.

THE COURT: Does anybody else have any questions for me? No. Once again, I'd like to emphasize that as between the parties, that settlement agreement is effective now. You have a contract, you have an agreement.

It will be within Judge Barnes's discretion whether to approve it so that all parties in it are aware of it under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

I thank you all. You've worked hard. I appreciate your being here today. Are there -- is there anything else?

MR. GIESEKE: Thank you, Your Honor. I don't think either side is very happy with the settlement, but I think that is the sign of a good settlement. So thank you.

THE COURT: Thank you.

MR. CRAM: Yes, Your Honor. On behalf of Ally, we just wanted to thank you for your efforts and your time spent.

And again, thank you to the trustee as well for agreeing to participate in this conference.

THE COURT: I think the settlement actually makes sense for everybody based upon all the difficulties that exist

in this case, economic and otherwise. I thank you all again. Have a pleasant --

MR. HUMPHREY: Thank you, Your Honor.

MR. KEELER: Thank you, Your Honor. Appreciate it.

THE COURT: Bye-bye.

MR. KEELER: Thank you. Bye.

(Proceedings concluded at 12:27 p.m.)

* * * * *

## C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Heidi Jolliff

HEIDI JOLLIFF, AAERT NO. 2850 DATE: June 15, 2026

ACCESS TRANSCRIPTS, LLC

# Exhibit 2

Exhibit 2

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made as of June __, 2026, by and between W. Donald Gieseke, Chapter 7 Trustee ("Trustee") on behalf of MRH Auto-Reno LLC ("Debtor") and Debtor's Bankruptcy Estate (together, the "Debtor Parties") in the Chapter 7 case now pending as case number 23-50502-hlb (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), on the one hand, and Ally Financial Inc., Ally Bank (together with Ally Financial Inc. referred to as the "Ally Parties") and Motors Insurance Corporation ("MIC") (collectively the Ally Parties and MIC are referred to as "Ally"), on the other hand. Ally and the Debtor Parties, are referred to as the "Parties" or, each individually, as a "Party."

## RECITALS

**WHEREAS**, the Debtor filed for protection under chapter 11 of the Bankruptcy Code on July 24, 2023 (the "Petition Date") in the Bankruptcy Court for the District of Nevada ("Bankruptcy Court") as Case No. 23-50502-hlb ("Bankruptcy Case").

**WHEREAS**, on November 27, 2023, the Ally Parties filed their Proof of Claim [*Claim 33-1*] evidencing a claim in the amount of $12,979,728.58 as of the Petition Date.

**WHEREAS**, on November 27, 2023, MIC filed its Proof of Claim [*Claim 32-1*] evidencing a claim in the amount of $691,948.25 as of the Petition Date.

**WHEREAS**, on April 17, 2024, the Bankruptcy Court entered an Order converting the Bankruptcy Case from a chapter 11 proceeding to a chapter 7 proceeding [*Docket No. 169*], and Trustee was appointed as the Chapter 7 Trustee.

**WHEREAS**, on July 23, 2025, Trustee initiated an Adversary Proceeding by filing a complaint against Ally ("Adversary Complaint"), Adversary Case No. 25-05023-hlb, seeking recovery of certain allegedly preferential and fraudulent transfers made by Debtor and objecting to both the Ally Parties' and MIC's Proofs of Claim (the "Adversary Proceeding").

**WHEREAS**, on September 15, 2025, Ally filed an Answer to the Adversary Complaint generally denying the claims asserted in the Adversary Complaint and asserting various affirmative defenses. On April 23, 2026, Ally filed an Amended Answer to the Adversary Complaint ("Answer").

**WHEREAS**, pursuant to the Bankruptcy Court's Order Scheduling Settlement Conference entered in the Adversary Proceeding on March 16, 2026, the Parties participated in a settlement conference on May 14, 2026, with the Honorable Gregg W. Zive presiding as the settlement conference judge, where the Parties, after investigating their respective rights and claims, settled those rights and claims fully and finally consistent with the terms stated on the Bankruptcy Court's record and memorialized in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Recitals Incorporated.** The Parties acknowledge and agree that the Recitals set forth above are true and accurate and the Parties incorporate such Recitals into and make them a part of this Agreement.

2. **Contingent on Bankruptcy Court Approval.** This Agreement is contingent on the Bankruptcy Court entering a final order pursuant to Fed. R. Bank. P. 9019 approving the terms of this Agreement. The Parties shall cooperate in the preparation and filing of a motion with the Bankruptcy Court for approval of the settlement as documented by this Agreement, so that said motion is filed within ten (10) business days of the execution date (the "9019 Motion"). Ally shall prepare the initial draft of the 9019 Motion and shall circulate it to counsel for the Debtor Parties for review and comment. The Parties shall use best efforts to obtain approval of the 9019 Motion, including, without limitation, defending it against any objections. Any order issued by the Bankruptcy Court granting the 9019 Motion shall approve and incorporate this Agreement as part of its terms.

3. **Effective Date.** This Agreement shall become effective on the date of entry of an unstayed order by the Bankruptcy Court approving the 9019 Motion and authorizing the Trustee and Debtor Parties to enter into the transactions contemplated by this Agreement or, if such order is stayed, at such time as such order is no longer stayed (the "Effective Date").

4. **Settlement Payment.** Within twenty-one (21) days after the later of the Effective Date and Ally's receipt of a completed and executed Form W-9 from Trustee, payment instructions, and contact information for an individual able to verify the instructions, Ally shall pay Trustee, on behalf of Debtor's Bankruptcy Estate, the sum of $250,000 (the "Settlement Payment"). The Settlement Payment shall be made by wire transfer payable to Trustee on behalf of Debtor's Bankruptcy Estate to the account designated in the payment instructions provided by Trustee.

5. **Dismissal of Adversary Proceeding with Prejudice.** Within five (5) days of the Trustee's receipt of the Settlement Payment, Trustee shall dismiss the Adversary Proceeding with prejudice.

6. **Allowance of the Ally Parties' Claim and Waiver of Distribution.** The Ally Parties' claim shall be allowed as an unsecured claim; however, the Ally Parties have agreed to waive any distribution from Debtor's Bankruptcy Estate in connection with their allowed unsecured claim. For avoidance of doubt, however, and notwithstanding anything in this Agreement indicating otherwise, the Ally Parties do not hereby and have not released or in any way waived any claims, in whole or in part, that the Ally Parties have or may have, under contract or otherwise, at law or in equity, against the Debtor.

7. **Allowance of MIC's Claim and Waiver of Distribution.** MIC's claim shall be allowed as an unsecured claim; however, MIC has agreed to waive any distribution from

Debtor's Bankruptcy Estate in connection with its allowed unsecured claim. For avoidance of doubt, however, and notwithstanding anything in this Agreement indicating otherwise, MIC does not hereby and has not released or in any way waived any claims, in whole or in part, that MIC has or may have, under contract or otherwise, at law or in equity, against the Debtor.

8. **Mutual Releases.**

a. Trustee and each of the Debtor Parties, on behalf of himself, itself and their respective present and former parents, subsidiaries, agents and assigns, as applicable, hereby irrevocably releases, waives, forever discharges and covenants not to sue Ally and each of their respective present and former, direct and indirect, parents, subsidiaries, affiliates, partners, shareholders, equity holders, employees, officers, directors, managers, lenders, agents, attorneys, advisors, insurers, representatives, predecessors, successors, and assigns (collectively, the "Ally Related Parties") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims (including third-party claims), and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, suspected or unsuspected, in law, admiralty, or equity, which any Party ever had, now has, or hereafter can, shall, or may have against the Ally Related Parties for, upon, or by reason of any matter, cause, or thing whatsoever related to, in connection with or arising from the facts and circumstances described in the Recitals, the Bankruptcy Case, the Adversary Complaint and the negotiation of this Agreement (collectively, the "Ally Released Claims"); *provided*, that the Ally Released Claims shall not include any claims relating to rights and obligations preserved by, created by, or otherwise arising out of this Agreement or any claims the Debtor Parties may have against any other persons or entities other than the Ally Related Parties.

b. Ally, on behalf of itself and their respective present and former parents, subsidiaries, agents and assigns, as applicable, hereby irrevocably releases, waives, forever discharges and covenants not to sue the Trustee, his employees, agents, attorneys, advisors, insurers and representatives and the Debtor's Bankruptcy Estate (collectively, the "Debtor Related Parties") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims (including third-party claims), and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, suspected or unsuspected, in law, admiralty, or equity, which any Party ever had, now has, or hereafter can, shall, or may have against the Debtor Related Parties for, upon, or by reason of any matter, cause, or thing whatsoever related to, in connection with or arising from the facts and circumstances described in the Recitals, the Bankruptcy Case, the Adversary Complaint and the negotiation of this Agreement (collectively, the "Debtor Released Claims" and, with the Ally Released Claims, the "Released Claims"); *provided*, that the Debtor Released Claims shall not include any claims relating to rights

and obligations preserved by, created by, or otherwise arising out of this Agreement or any claims against guarantors of Debtor's obligations owing to Ally pursuant to guarantees or otherwise.

c. Each of the Parties acknowledges that it may, after executing this Agreement, discover facts other than or different from those which they know or believe to be true with respect to the Parties. Notwithstanding any such discovery of facts, the Parties waive and fully, finally, and forever settle and release any Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other facts. The Parties expressly waive and release any and all provisions, rights, and benefits conferred by section 1542 of the California Civil Code—or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to section 1542 of the California Civil Code—which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

9. **Acknowledgment.** Each Party acknowledges and agrees that: (a) in making its decision to execute this Agreement, such Party has relied and will rely solely upon the results of its independent investigation, due diligence review and verification and the terms and conditions of this Agreement, and will not be entitled to rely on any other statements or advice from the other Parties or their respective affiliates or representatives; (b) no Party has made or is making any express or implied representations or warranties to the other Party, except as expressly set forth in this Agreement; (c) this Agreement is executed voluntarily by it, without duress or undue influence on the part of, or on behalf of it; (d) each Party has had the opportunity to receive, and has in fact received, representation by counsel of its choice in the negotiation for, and in the performance and execution of, this Agreement; and (e) each Party has read this Agreement and had the terms of this Agreement fully explained to it by its counsel and is fully aware of the contents of this Agreement and the legal effect thereof. Each Party further acknowledges and agrees that, in making its decision to execute this Agreement, it is not relying on any Party to provide it with any information, facts, projections, forecasts, analysis, documents, or materials that may be relevant to such decision and is making its own decision without any such reliance.

10. **Representations and Warranties of the Parties.**

(a) Each Party represents that it owns and has not assigned or otherwise transferred to any other person or entity any of such Party's rights and claims or causes of action as are being altered or otherwise affected pursuant to the terms of this Agreement.

(b) Each individual signing this Agreement on behalf of the Parties represents and warrants that he or she is duly authorized and fully competent to do so.

11. **No Admission.** This Agreement represents a compromise of the Released Claims and shall not in any way be considered an admission of liability by any of the Parties, which liability is at all times expressly denied.

12. **Allocation of Costs and Fees.** Each Party shall be solely responsible for its own attorneys' fees in the negotiation and preparation of this Agreement, and for any fees, costs or expenses incurred in complying with its obligations hereunder.

13. **No Tax Advice; Responsibility for Taxes.** Each Party acknowledges and agrees that (a) neither the other Party nor any of its respective past or present officers, directors, employees, agents, representatives, insurers, or attorneys has made any representations to such Party regarding the tax consequences of this Agreement or any payments or transfers made or to be made under it; (b) neither Party is relying on any statement or omission by the other Party or the other Party's attorneys as tax advice; and (c) each Party has had the opportunity to consult, and is advised to consult, with its own independent tax advisors regarding the tax consequences of this Agreement. Each Party shall be solely responsible for (i) any and all federal, state, and local taxes, assessments, interest, and penalties arising from or related to such Party's receipt and or transfer of any payments or other consideration under this Agreement and (ii) its own reporting obligations. The Parties further agree that nothing in this Agreement is intended, or shall be construed, as tax advice to any Party.

14. **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their legal representatives, predecessors, successors and assigns.

15. **Entire Agreement.** This Agreement contains the entire agreement and understanding between the Parties pertaining to the subject matter of this Agreement and supersedes and replaces all prior and contemporaneous negotiations, agreements and proposed agreements, written or oral. This Agreement may be modified only by a writing signed by each of the Parties hereto or their duly appointed agents.

16. **Severability.** Should any provision of this Agreement be held unenforceable or contrary to law, such provision shall be severed and the remaining provisions of this Agreement shall remain in full force and effect; provided, however, that if such unenforceable or invalid provision is material to the Parties' agreement, the Parties shall negotiate in good faith to modify the Agreement to effectuate the original intent of the Parties as closely as possible in a mutually acceptable manner.

17. **Construction.** The Parties to this Agreement acknowledge that they have read all of the terms of this Agreement and have entered into those terms voluntarily after obtaining the advice of independent legal counsel. This Agreement shall be deemed to have been jointly drafted by the Parties hereto and shall be construed accordingly. No provision shall be construed or interpreted for or against either of the Parties.

18. **Governing Law.** The Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to resolve any disputes in connection

herewith. This Agreement shall be interpreted and enforced pursuant to the laws of the State of Nevada, irrespective of its choice of law rules.

19. **Attorneys' Fees.** If any action at law or in equity, including an action for declaratory or injunctive relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing Party shall be entitled to its reasonable costs in prosecuting or defending said action, including a reasonable amount of its attorneys' fees, which may be set by the court in which the action for enforcement is brought, or in a separate action for that purpose, in addition to any other relief to which the prevailing party may be entitled.

20. **Counterparts; Electronic Copy of Signatures.** This Agreement may be executed by the Parties on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Electronic signatures (*e.g.*, through DocuSign or similar services) and/or PDF (original execution signature scanned version) signatures shall be treated in all manner and respects as a binding and original document, and the signature of any Party shall be considered for these purposes as an original signature.

**IN WITNESS WHEREOF**, each of the Parties hereto, intending to be legally bound, have caused this Agreement to be executed as of the date set forth above.

**MRH AUTO – RENO LLC**

By: *W. D. Gieseke, Trustee*
W. D. Gieseke, Trustee (Jul 6, 2026 15:49:42 PDT)
W. Donald Gieseke, Chapter 7 Trustee

**W. DONALD GIESEKE, CHAPTER 7 TRUSTEE**

By: *W. D. Gieseke, Trustee*
W. D. Gieseke, Trustee (Jul 6, 2026 15:49:42 PDT)
W. Donald Gieseke, Chapter 7 Trustee

**ALLY FINANCIAL INC.**

By: Signed by: *Michael D Keeler*
CEA43D2F87524C8...
Michael Keeler, Authorized Representative

**ALLY BANK**

By: Signed by: *Michael D Keeler*
CEA43D2F87524C8...
Michael Keeler, Authorized Representative

**MOTORS INSURANCE CORPORATION**

By: Signed by: [signature]
4E90C99B07604E0...
Russell Walsh, Authorized Representative